Howard POLIN, etc., et al., Appellants,

v.

CONDUCTRON CORPORATION et al., Appellees.

No. 76–1207.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 9, 1976.

Decided March 23, 1977.

Rehearing and Rehearing En Banc Denied April 14, 1977.

Edward F. Mannino, Philadelphia, Pa., for appellants; Jeffrey A. Less and Lawrence D. Berger, Dilworth, Paxson, Kalish & Levy, Philadelphia, Pa., Robert S. Allen, Lewis, Rice, Tucker, Allen & Chubb, St. Louis, Mo., Harold E. Kohn and Stuart H. Savett, Kohn, Savett, Marion & Graf, Philadelphia, Pa., on the brief.

Richmond C. Coburn, St. Louis, Mo., for appellees, Siegel, Olsen and Cutrona; G. Lane Roberts, Jr., and Thomas E. Douglass, St. Louis, Mo., Dykema, Gossett, Spencer, Goodnow & Trigg, Detroit, Mich., on the brief.

Veryl L. Riddle, St. Louis, Mo., for appellees, McDonnell Douglas Corp., et al.; Thomas C. Walsh and John J. Hennelly, Jr., of Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., on the brief.

Before GIBSON, Chief Judge, BRIGHT, Circuit Judge, and TALBOT SMITH,* Senior District Judge.

TALBOT SMITH, Senior District Judge.

This is an action brought by plaintiff Howard Polin, a shareholder of Conductron Corporation (hereafter Conductron), charging defendants with violations of the federal securities laws and breach of their fiduciary duties.[1] Named as defendants are Conductron, McDonnell Douglas Corp. (MDC) and several officers and directors of Con-

---

\* TALBOT SMITH, Senior District Judge, Eastern District of Michigan, sitting by designation.

1. The instant litigation commenced in 1969 when plaintiff filed his complaint in the United States District Court for the Eastern District of

ductron and MDC. Plaintiff asserts both individual and derivative claims. Additionally, plaintiff seeks to maintain his individual claims as the representative of the class of similarly situated stockholders of Conductron.

Prior to trial, the District Court[2] refused to certify plaintiff's individual claims as class actions. After trial by the Court, judgment on the merits was entered for defendants. *Polin v. Conductron Corp.*, 411 F.Supp. 698 (E.D.Mo.1976). We affirm.

Conductron was incorporated in Delaware in November, 1960. Initially, Keeve M. Siegel held 80 per cent of its stock and Paramount Pictures the other 20 per cent. Siegel, who had been a Professor of Electrical Engineering at the University of Michigan and the director of the University's Radiation Laboratory, became Conductron's President and, in 1961, Chairman of the Board.

Conductron, the bulk of whose facilities were in Ann Arbor, Michigan, was engaged in electronics research and development. The major part of Conductron's business, until 1966, was with the United States Government and its contractors.

By 1964, Conductron scientists and engineers had made several advances, particularly in radar. Conductron, however, lacked the large scale production facilities needed to obtain government production contracts. In the spring of 1964, Conductron entered into negotiations with McDonnell Aircraft Corp. (MDC[3]), which had only a few months earlier purchased Paramount's Conductron stock, for the acquisition of additional production facilities. An agreement was signed on January 7, 1966.

According to the agreement, MDC would receive 1,850,000 newly-issued shares of Conductron stock, giving it over 80 per cent of Conductron's outstanding stock. Conductron would receive all of the business and assets of MDC's Electronic Equipment Division (EED), all of the capital stock of Tridea Electronics Co., a wholly-owned subsidiary of MDC, and $5,000,000 in cash. A notice of a special shareholders' meeting, proxy material, and a letter from Siegel recommending approval of the transaction were sent to Conductron's shareholders. The Conductron shareholders voted to approve the transaction, which was closed on January 27, 1966.

Approximately a year later, on January 30, 1967, the Executive Committee of Conductron voted to acquire the assets subject to liabilities of Advanced Communications, Inc. (ACI) in exchange for 3,482 shares of Conductron stock. As additional consideration for the purchase, Conductron assumed a $300,000 note, then owing by ACI. Forty-six per cent of ACI's stock had been owned by MDC. The Conductron acquisition of ACI was consummated on February 25, 1967.

At the same meeting, Conductron's Executive Committee decided to reject a proposal that Conductron acquire Hoffman Products Co., a manufacturer of radios, televisions, and stereo equipment for Montgomery Ward, and Hoffman Electronics Co. The Hoffman acquisition had been negotiated by Siegel, who had continued as Chairman of the Board and President of Conductron after MDC's acquisition of 80 per cent of Conductron's stock. Siegel favored Conductron's acquisition of Hoffman, but was opposed to the ACI acquisition. However,

Pennsylvania. In 1971, plaintiff filed a second suit in the Eastern District of Pennsylvania against several of the same defendants. In 1972, Judge Higginbotham ordered both suits transferred to the Eastern District of Missouri. The two suits were then ordered consolidated into one action for all purposes, and plaintiff, by leave of court was permitted to file a consolidated amended complaint.

Jurisdiction is predicated on section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, diversity, and pendent jurisdiction.

2. The Honorable John K. Regan, United States District Judge for the Eastern District of Missouri.

3. After merging with Douglas Aircraft Co., McDonnell Aircraft changed its name to McDonnell Douglas Corp. We will use "MDC" to refer to McDonnell Aircraft Corp. and all successor corporations, including McDonnell Douglas.

he was outvoted 2–1 in Conductron's Executive Committee. Siegel then resigned from all of his positions with Conductron, and disposed of all of his Conductron stock during February, 1967.[4]

Siegel's responsibilities were assumed on a temporary basis by R. A. Olsen, Vice President of Conductron, who was given the additional title, "Acting General Manager." On April 27, 1967, Walter F. Burke, a director and officer of MDC was elected President of Conductron. Olsen disposed of his Conductron stock in July, 1967. He left Conductron on October 21, 1967 and immediately became an officer and director of K.M.S. Industries, Inc., in which he had invested the proceeds from the sale of his Conductron stock. .

Conductron was eventually merged into McDonnell Douglas Electronics Co. (MDEC) and its separate corporate existence terminated. This merger as well has been the subject of attack and will be considered by us *infra*.

Originally, two suits were filed respecting different aspects of Polin's claims. Both were transferred to the Eastern District of Missouri and, by order of the Court, consolidated into one action. Thereafter, as we have noted, plaintiff filed a consolidated amended complaint covering both actions. The consolidated amended complaint contained five counts. Counts I and II, resolved adversely to plaintiff at trial, have not been pursued in this Court.

In Count III of plaintiff's consolidated amended complaint, he brought an individual and class action under §§ 10(b) and 14(a) of the Securities Exchange Act of 1934 (1934 Act) and Rules 10b–5 and 14a–9 thereunder,[5] for damages allegedly suffered by plaintiff and "all other similarly situated

---

**4.** Siegel invested over two million dollars of the proceeds from the sale of his Conductron stock in K.M.S. Industries, Inc., which he founded shortly after his departure from Conductron.

**5.** Section 10 of the 1934 Act, 15 U.S.C. § 78j, provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \* \* \* \*

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Securities and Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(1) to employ any device, scheme or artifice to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

Section 14(a) of the 1934 Act, 15 U.S.C. § 78n(a), provides:

It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section [12] of this title.

Securities and Exchange Commission Rule 14a–9, 17 C.F.R. § 240.14a–9 provides, in relevant part:

(a) No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meet-

shareholders of Conductron" as a result of their purchases of Conductron stock between 1966 and 1969. The plaintiff twice moved to have this count certified as a class action, the District Court rejecting both motions.

The first motion was submitted after extensive discovery with respect to the class action issue, the submission of briefs and oral argument thereon.[6] The court denied class action certification, pointing out that the charges made related to allegedly false and misleading statements in proxy statements, financial statements, Annual Reports and other documents allegedly relied upon by purchasers of Conductron stock in the years 1966, 1967, 1968, and 1969, that the number of such purchasers was estimated to be in excess of 2600, that the purchase dates of the various buyers would be of importance in determining the rights of each purchaser,[7] that 1966 buyers could not have been influenced by the alleged 1967, 1968 or 1969 false representations, and that the facts common to purchasers "in the

various years do not, under the present record, predominate."[8] It was the court's final conclusion that the factual issues were "too diverse to warrant class treatment."[9] Moreover, it was clear on the record, that plaintiff had, throughout the years, while charging various malfeasances and misfeasances against the defendants, continuously purchased Conductron stock himself, despite the gravity of the charges made, thereby raising the most serious questions as to whether or not he was a proper "representative" of the allegedly injured class.[10] The Court's conclusion on all of this was "that the claim would be completely unmanageable if it were sustained as a class action."[11]

It is well settled that the trial court has broad discretion in determining whether a class action may be maintained and its determination should be given great weight by a reviewing court. *Wright v. Stone Container Corp.,* 524 F.2d 1058, 1061 (8th Cir. 1975); 3B *Moore's Federal Practice* ¶ 23.50.[12]

ing or subject matter which has become false or misleading.

\* \* \* \* \* \*

NOTE: The following are some examples of what, depending upon particular facts and circumstances, may be misleading within the meaning of this rule:

(a) Predictions as to specific future market values, earnings, or dividends.

(b) Material which directly or indirectly impugns character, integrity or personal reputation, or directly or indirectly makes charges concerning improper, illegal or immoral conduct or associations, without factual foundation.

(c) Failure to so identify a proxy statement, form of proxy and other soliciting material as to clearly distinguish it from the soliciting material of any other person or persons soliciting for the same meeting or subject matter.

(d) Claims made prior to a meeting regarding the results of a solicitation.

On this appeal, plaintiff has, with respect to Count III, placed sole reliance upon § 10(b) of the 1934 Act and Rule 10b–5 thereunder.

6. A renewed motion was filed on April 29, 1974, with trial then set for May 6, 1974, having been so set on January 4, 1974. Trial was then passed for a week "to accommodate plaintiff's counsel" and the renewed motion denied on the ground of untimely filing, "further delay

[in] the trial for a protracted period," and finally on the ground that "our original ruling was correct and should not be modified."

7. Plaintiff asserted, *inter alia,* that the price of Conductron stock was artificially inflated as a result of the totality of misleading statements.

8. District Court Memorandum, unreported, App. 219–20.

9. *See* Fed.R.Civ.P. 23(b)(3).

10. *See* Fed.R.Civ.P. 23(a)(4).

11. The rationale of the Court's holding with respect to the class action aspects of Count III, was properly held by the Court to be equally applicable to Counts IV and V, discussed *infra.*

12. *See also City of New York v. International Pipe and Ceramics Corp.,* 410 F.2d 295, 300 (2d Cir. 1969):

In final analysis, resolution of the question now presented [class action certification] reverts to the "fair and efficient adjudication" problem. The trial judge will have to face this problem in a realistic way. He should be afforded the greatest latitude in the exercise of his judgment after a careful factual exploration as to how this result can be attained.

We are satisfied that the court has carefully weighed the controlling factors and we are unpersuaded that there has been any abuse of discretion in the subject rulings.

It is the claim of the plaintiff that the January, 1966 proxy statement, the 1965 Annual Report, as well as the First 1966 Annual Report, the Second 1966 Annual Report, the 1967 Annual Report, the Press Release of May 3, 1968, and the 1968 Annual Report, all contained false and misleading statements, "particularly with reference to Conductron's aircraft simulator business * * *."

In order to analyze properly the frauds allegedly practiced almost throughout Conductron's entire corporate life, it is necessary to acquire some perspective as to the simulator business, its origins, its prospects, and its costs, since all are comprehended, in one form or another, in fraud charges covering the years in question.

The simulator, as the name implies, simulates something else. With respect to aircraft, the simulator duplicates ("simulates") the cockpit of the plane. Through an intricate system of wiring and programming, and with the aid of computers, aircraft operating characteristics may be simulated for various situations, both routine and of serious nature. The entire plane performance is duplicated, from take-off, through systems performance, radio navigation and communication, descent, approach and ground operations. The savings accomplished through the use of a simulator are of substantial magnitude. The airplane being simulated, costing from $5,000,000 to $25,000,000 is released for other operations by a simulator costing from $1,000,000 to $2,000,000. Moreover, there is no danger during training to the fledgling pilot or his airplane. The training, in fact, is so detailed that after the simulator work is completed, only "one final flight in the airplane [is required] before they [the pilots] had to fly passengers * * *." [13]

But the problems involved in simulator manufacture parallel in complexity the operations of the machine itself, since the design, engineering, and manufacture require from two to five years. Since the simulator must match exactly the airplane it is intended to simulate, plane changes require simulator changes, and even between planes of the same general design, such as the Boeing 737, to simulate one is not to simulate all. In addition, different airlines flying the same plane may order different cockpit configurations, as changes are made in equipment, causing unanticipated and substantial losses, arising not only from production design costs but also from changes in the hardware that goes into the simulator cockpit.

The simulator engineers with the Electronic Equipment Division (EED) of MDC did not come to Conductron as novices.[14] As Mr. Toole, then an employee of EED put it, "My feelings were that we had a technical break-through in simulation, one that was worth pursuing as a new line of business. One that had a great deal of potential with the airlines and with the military." The new line of business was anticipated to be profitable, not only because of a large upswing in the purchases of aircraft, but because EED's advanced technology made the competition "rather minimal, in that no large companies who you might say had huge resources behind them were involved." [15] But the roseate future envisioned did not materialize. In fact, the operation foundered.

MDC, through the EED division, obtained contracts for one 737 simulator from Boeing in September, 1965 and for two more 737 simulators from United Airlines the following month. "Everybody was pretty pleased," testified Mr. McDonnell, Chairman of the MDC Board, in his deposition.

13. Testimony of Mr. Toole, Project Manager Trainers and Simulators, Conductron Corp.

14. We note that EED had designed simulators for the Mercury and Gemini spacecraft.

15. Testimony of Mr. Murray, Executive Vice-President, MDC, and director of Conductron, 1966–1971.

In January of 1966 Conductron acquired EED. The contracts for the three 737 simulators were transferred from EED to Conductron, MDC promised Conductron continued business, paid $5,000,000 as part of the agreement, and promised substantial grants for research.[16] It is significant that all parties here recognized the need for additional funds for this purpose.

Increased aircraft purchases were made by the airlines in September of 1966.[17] Conductron felt that its technology would be of great interest to the lines "and it was apparent to us that we would make a lot of sales."[18] But Conductron anticipated achieving a substantial "commonality"[19] among the same aircraft. This did not result. The aircraft (Boeing 737) was itself changed, cockpits were altered, each airline in effect wanted its own simulator with the result that substantial losses were suffered by Conductron. In addition, "competitions were quite vicious,"[20] with the result that prices were steadily driven down. Other factors contributed, and in substance, the aircraft market dried up.[21] In addition, special problems developed with the C–5A military aircraft simulator which Conductron was building for Lockheed.[22]

We turn to the matter of costs and the reporting thereof. Obviously, the research and development costs could not be borne by the first model produced. The cost assigned to any unit[23] depended upon the competitive market, cost estimates, and the number of the model to be produced. It is clear that at this point an accounting and disclosure problem is presented.

■ Conductron made its agreement with MDC for acquisition of EED on January 7, 1966. It is with respect to the representations made, and omitted, in the proxy statement issued in connection therewith that plaintiff's initial charges of misrepre-

---

16. In 1964, MDC purchased 20 per cent of the outstanding common stock of Conductron Corporation of Ann Arbor, an electronics research and development firm.

 The January 7, 1966 agreement between MDC and Conductron provided that MDC would acquire 1,850,000 newly issued shares of Conductron stock in return for all the business and assets of EED, all the capital stock of Tridea Electronics Company, and $5,000,000 cash.

 The agreement gave MDC slightly more than 80 per cent of the outstanding stock of Conductron.

 Notice of a shareholders meeting on January 25, 1966 and a proxy statement, together with a letter from Mr. Siegel, President of Conductron, were sent to Conductron shareholders concerning the proposed transaction.

17. Testimony of Mr. Toole.

18. *Id.*

19. In general the term refers to a fundamental similarity of design, with only minor variations, applicable to different planes.

20. Testimony of Mr. Murray.

21. Mr. Braun, now Vice-President of McDonnell Aircraft Co. and General Manager of the F–15 Program, joined Conductron in January of 1966. His testimony as to the decline in business reflects the difficulties faced by the corporation. As to the airlines' needs as the years went on in 1968, 1969 and 1970:

 Well, as the years went on there, why, the airlines' business declined considerably. The number of new aircraft that they were placing on order dropped off rather drastically and the net result was that the airlines suddenly discovered that they had more aircraft than they knew what to do with. In other words, airplanes were being tied down for lack of use. So there was a trend at that time to move back away from purchasing simulators and instead use that extra aircraft capacity which they had to do their training. And then this problem, of course, was compounded from our standpoint with the 737, due to the fact that Boeing's projections as far as 737 sales were particularly off. The 737 did not, in fact, turn out to be as competitive an aircraft as Boeing had hoped. In fact, the 737 is the only commercial airliner I believe that Boeing has built that actually lost money up to the present time. So unfortunately, again, we were tied in with an airplane there that didn't turn out as well as it was hoped.

22. The C–5A simulator contract was a fixed price-incentive contract, allowing the contractor to recover its costs but only up to a specified maximum. Conductron's cost substantially exceeded the maximum, as a result, in large measure, of the many design changes which were made in the C–5A by Lockheed after work had begun on the simulator.

23. The sales of commercial simulators were under fixed price contracts.

sentation arise. The plaintiff's principal challenge is that the proxy statement did not disclose the anticipated losses in the simulator business. The short answer, on the record, is that defendants anticipated substantial profits, not losses. It is true that defendants' roseate economic anticipations were doomed, but economic prognostication, though faulty, does not, without more, amount to fraud. Moreover, the proxy statement gave fair warning that the development and other start-up costs would depend for recovery upon future contracts. The information disclosed with reference thereto stated:

> The Division recently received contract awards from the Boeing Company and United Air Lines to design and build three 737 aircraft transport pilot training simulators for a total of $2,760,966. Expected additional contracts for the Boeing 737 simulator will be necessary to recover development and other start up costs.[24]

It could not reasonably be said that an investor of plaintiff Polin's experience[25]

---

**24.** Appendix at 1516.

**25.** Mr. Polin has, for many years managed extensive stock portfolios. The net value at the time of the trial of his personal holdings was approximately $100,000. Mr. Polin also manages the portfolio of Bishop Processing Co., the net value of which was approximately $900,000 at the time of the trial. (The Polin family owns indirectly 49.7 per cent of the stock of Bishop Processing.)

Mr. Polin's and Bishop Processing's stock holdings run the gamut from blue chips, such as Gulf and Western Industries, Inc., Appendix at 1137, to the stock of corporations which, like Conductron, are primarily engaged in developing new products through scientific research.

**26.** Cross-examination of Mr. Polin:

Q And, sir, I take it that you know from your training and your business success that research and development is merely a first stage or first step in making a viable product that will ultimately generate a profit?

A Yes, sir.

Q That is the substance of what research and development is all about, isn't it?

A Yes, sir.

\* \* \* \* \* \*

Q You also knew, I take it, that it was possible that a company in research and development might strike out completely, didn't you?

A On any one item, yes, sir.

---

was unaware of the significance of this statement.[26]

But beyond the minutiae of the various charges made and behind them as justification therefor, running through the entire series of reports, lies a fundamental accounting problem, namely, when and how Conductron should have written off the design and development costs of the simulator program. These costs were large and could not be charged in their entirety against the first simulators from a competitive standpoint. An amortization over the entire contract life was utilized.[27] If a sufficient number of simulators are sold, amortization presents no problem. If not, due to economic conditions, lack of acceptance of the plane, or other cause, the manufacturer will suffer a loss. The point to be observed here is the fact that a disparity between expenditures and selling price of an early simulator does not result in a "loss." The Conductron Corporation followed a system of accounting employed under these circumstances by its accountants, Ernst & Ernst,

---

**27.** Direct Examination of Mr. Toole, Project Manager for Trainers and Simulators at Conductron:

> Mr. MANNINO: \* \* \* I think it is important to determine at this point whether or not an amortization procedure as opposed to an instant write-off procedure was used on the simulators \* \* \*.
>
> \* \* \* \* \* \*
>
> THE WITNESS: Well, I was not in the financial side of our company, and I don't know exactly how this was handled from a financial standpoint, but my understanding was that we would spread the development cost over a quantity of simulators. The quantity was predicted based primarily on the number of aircraft that would be purchased. The airlines had a policy of buying one simulator for about every twenty airplanes they bought, and we could look at the aircraft market itself and predict the requirement for simulators at the various airlines.
>
> \* \* \* \* \* \*
>
> Q Now, can you explain what Conductron did in order to recover development costs in its prices, if it did anything?
>
> A This was what we were amortizing over the predicted market.

under which initial non-recurring costs were allocated pro-rata over the life of the program, rather than being charged off in their entirety at the beginning of the program.

■ Plaintiff's complaints about the annual reports all revolve around the dates of the reporting of what plaintiff terms "anticipated simulator losses" and the accuracy of the accounting judgments made.[28] As to the latter, these are matters of judgment,[29] a judgment clearly dependent upon constantly changing factors.[30] It was in recognition by Ernst & Ernst of such variables present in the operation being conducted that no provision for losses was made until

the Second 1966 Annual Report, covering the period July 1—December 31, 1966. The Ernst & Ernst Report approving the financial statements in the Second 1966 Annual Report was dated March 17, 1967. Mr. Anderson, the Ernst & Ernst partner in charge of the Conductron auditing, testified that "I would think that there was significantly more information available in March of 1967 than there was in July of 1966," [31] this latter being the date of the Ernst & Ernst Report approving the financial statements in the First Annual Report for 1966. Such information required the recognition of certain losses at that time, but Ernst & Ernst cautioned the corporation about the diffi-

---

**28.** One of plaintiff's specific charges was that in its Annual Report for the six months ended June 30, 1966, "Conductron failed to charge off against income or otherwise disclose its anticipated multi-million dollar loss on the existing contracts for the three 737 simulators, instead charging off only $796,195 of the total anticipated loss." Brief for Appellant at 9. Mr. Schumer, a certified public accountant, testified that the $1.2 million after-tax loss written off in the Second Annual Report for 1966, covering the six months ending December 31, 1966, should have been written-off in the First Annual Report for 1966, issued on or about September 6, 1966, because "the same set of facts existed, same situation * * *." However, Mr. Schumer's assertion that Conductron had the same degree of knowledge regarding losses on its simulator contracts at the time of the First Annual Report of 1966 as at the time of the Second Annual Report is far from convincing, and was contradicted by testimony which will be considered *infra*, at p. 806. Moreover, on cross examination, Mr. Schumer testified that he had not examined the "commonality" which had been established as of June 30, 1966, as compared with that of December 31, 1966. Failure to achieve expected "commonality" would have an effect upon costs and hence upon anticipated losses.

Likewise, fraud is charged with respect to the 1967 Annual Report on the ground that "anticipated" losses had not, as the report stated, been charged off, and, further, that the report stated that the results for 1968 were "expected" to show improvement, and the Company saw a "possibility" of a break-even soon. The terms thus employed bespeak caution in outlook and fall far short of the assurances required for a finding of falsity and fraud. Language of expectation, of anticipation, and of possibilities recognizes the imponderable influences of complex variables in a fast-changing field.

**29.** Deposition testimony of Mr. Burke, President of Conductron during most of 1967–70, and an officer and director of MDC during the time in question:

If you have a long-run program, it enables you to help even out the unit costs throughout the life of the program, and that's a factor, I didn't say it is a merit, it is a factor in making such a choice.

Another alternate is examining the market. If you are uncertain of the market, the more conservative approach, then, is to write off start-up and development costs in the earlier part of the contract so that while you have to pay a charge of higher cost per unit, your sales, if successful, will cover your start-up costs even for a short or small number of units.

There is no what I would call absolute standard for when you do which. It is very much a matter of judgment of the Management.

**30.** Direct examination of Mr. Braun:

Q Now, how was it decided at Conductron, if you know, what number of simulators of a particular line such as the 737 line it was necessary to sell in order to recover the non-recurring costs?

A Well, we knew or estimated if—we hadn't finished the work at that point in time. We knew—estimated then what the non-recurring costs were to be and we estimated, of course, what our recurring costs were going to be, and then amortized that non-recurring to the point where we could determine the break-even point and then from then on, the profit potential. So out of that we could determine precisely what number of simulators we had to sell to break even based on the estimate at that point in time.

Now, this was obviously a changing thing as time went on.

**31.** Appendix at 1378.

culties inherent in making such judgments, stating, in part:

> [It] should be recognized that the estimates of losses referred to herein are subject to considerable revision as the contracts progress, based upon the demonstrated experiences to date.[32]

The financial reports we examine were certified by Ernst & Ernst to be fair and accurate after substantial investigative research.[33] The Court found, moreover:

> [W]e have carefully reviewed each of these reports, as well as the earnings statements and the press releases, in light of plaintiff's complaints and find that none of them are fraudulently misleading either by omissions or by affirmative statements. It is true, of course, that each report painted a gloomier picture of the extent of the losses incurred and anticipated than the preceding one, but there is no substantial basis for the contention that any of the reports withheld material information or fraudulently minimized losses which should have been anticipated.[34]

Under our review of this lengthy record we find no clear error of fact or misapplication of applicable law. There is no sustainable claim for damages or rescission.[35] What we had were, possibly, too-sanguine hopes for the future, as well as differences of opinion between accountants as to the complex problems of financial reporting of the new device, but the elements of fraud, the deceptions, the duplicities and the distortions normally concomitants of false and misleading statements, are completely missing.

In January of 1966, as heretofore noted, MDC and Conductron had agreed upon the acquisition by MDC of 1,850,000 shares of Conductron stock in return for the business and assets of MDC's Electronic Equipment Division, all of the capital stock of Tridea Electronics Company and a sum in cash. Tridea had owned a 46 per cent interest in Advanced Communications, Inc. (ACI), which interest had been retained by MDC at the time of the 1966 acquisitions. As time went on, however, it became apparent that ACI's technology was "too much for McDonnell Electronics' ability to manage"

**32.** Letter of March 16, 1967 from Ernst & Ernst to the Board of Directors of Conductron.

**33.** The plaintiff has not joined Ernst & Ernst as a defendant, although much of plaintiff's case against the defendants turns upon the alleged failings of the accountants in their reporting of the financial affairs of Conductron. So far as any negligence on the part of Ernst & Ernst is concerned, plaintiff has not stated a claim. *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) (private cause of action for damages will not lie under § 10(b) of the 1934 Act and Rule 10b-5 in the absence of any allegation of scienter-intent to deceive, manipulate or defraud).

**34.** *Polin v. Conductron Corp., supra,* 411 F.Supp. at 702.

Plaintiff's allegations that the court failed to make sufficient findings of fact are without merit. We addressed this issue in *United States ex rel. R. W. Vaught Co. v. F. D. Rich Co.,* 439 F.2d 895, 898–99 (8th Cir. 1971), holding that:

> Appellant Rich asserts that the trial court failed to make the necessary findings to permit an adequate appellate review. Appellant specifically charges the findings relating to Vaught's alleged delay in performance were

inadequate to sustain the trial court's conclusions of law. The trial judge made no separate findings, but instead incorporated them into his unreported memorandum opinion. Although the opinion does not elaborate or detail each subsidiary issue raised by defendant Rich in its claim for delay damages, the trial court clearly indicated the evidentiary basis for its decision on this issue.

> \* \* \* \* \* \*

> Although more extensive findings are certainly helpful in a case as complex as this, the district court's memorandum opinion sufficiently outlines the basis and underlying grounds for its decision, which is all that is required. [Cases cited.] Appellant Rich, who presented the trial court with 156 proposed findings, misconstrues the requirements of Rule 52(a), Fed.R.Civ.P. The trial court need not make specific findings on all facts and evidentiary matters brought before it, but need find only the ultimate facts necessary to reach a decision in the case. [Cases cited.]

**35.** As to the availability of a rescission remedy, we, of course, express no opinion in view of our holdings herein as to liability.

and "[i]t was * * * thought that putting ACI together with Conductron made a lot of sense" and would be beneficial to Conductron because of Conductron's technological and managerial capabilities. A difference of opinion developed among technical advisors as to the desirability of acquiring ACI. It was felt by some that despite its insolvency at that time, ACI's potential for future success was high, but by others that Conductron would be "acquiring a loss operation." The facts relating to both corporations were fully disclosed, with discussion thereof, though not with unanimity with respect thereto.

The matter came before the Executive Committee of Conductron on January 30, 1967. The proposal to acquire ACI, strongly recommended "on the engineering side," was approved by a vote of two to one.[36] The Board of Directors of ACI approved, with the absence noted in the record of A. C. Omberg, Vice President of MDC.[37] As a result of these and related corporate actions Conductron acquired 100 per cent of the assets of ACI, subject to its liabilities, in exchange for 3,482 shares (approximately .01% of Conductron's outstanding shares) of Conductron stock, and assumed a $300,000 note of ACI's. Subsequent to provisions for the $300,000 note, ACI's balance sheet showed a net worth of $154,361, for which Conductron paid $160,172 in its own shares.[38]

It is the claim of the plaintiff that MDC, as the parent and majority stockholder of its subsidiary, Conductron, "forced" Conductron to acquire ACI and that such action resulted in MDC's receipt of "something from Conductron to the exclusion of, and detriment to, the minority stockholders of Conductron," and upon such theory plaintiff asserts a derivative claim for damages. The defendants, on the other hand, argue that the issuance of Conductron stock did not confer an unjustifiable benefit on MDC, or deprive Conductron's public shareholders of a legitimate benefit.

The plaintiff first urges that the Conductron-ACI sale was a parent-subsidiary transaction. It is true that MDC controlled Conductron but its ownership of 46 per cent of ACI's stock did not necessarily vest in it control of ACI. Under Delaware law, non-majority stock ownership is not sufficient, by itself, to establish domination and control.

> A plaintiff who alleges domination of a board of directors and/or control of its affairs must prove it. *Blish v. Thompson Automatic Arms Corporation*, 30 Del.Ch. 538, 64 A.2d 581 (1948). Stock ownership alone, at least when it amounts to less than a majority, is not sufficient proof of domination or control. [Citing cases.]

*Kaplan v. Centex Corp.*, 284 A.2d 119, 122–23 (Del.Ch.1971).[39] The trial court found that MDC did not control ACI "in fact or in law" and there is no clear error in such finding.

There is much argument in the briefs as to whether the "intrinsic fairness" test [40] or the business judgment test [41] should be em-

---

**36.** The dissenting vote was cast by Siegel, who, nevertheless, testified that "[i]t was a very narrow decision," "a very small thing."

**37.** Mr. Omberg had been commissioned by Conductron and MDC to investigate ACI's situation and prospects.

**38.** The $160,172 figure is based upon the closing price of Conductron stock on the American Stock Exchange on February 25, 1967, the date of the ACI acquisition.

**39.** *See also Liboff v. Allen*, Civil Action No. 2669 (Del.Ch. Jan. 16, 1975); *Puma v. Marriott*, 283 A.2d 693, 695 (Del.Ch.1971).

**40.** "The standard of intrinsic fairness involves both a high degree of fairness and a shift in the burden of proof. Under this standard the burden is on Sinclair [a parent corporation, dominating a subsidiary] to prove, subject to careful judicial scrutiny, that its transactions with Sinven [its subsidiary] were objectively fair." *Sinclair Oil Corporation v. Levien*, 280 A.2d 717, 719–20 (Del.1971).

**41.** Under the business judgment rule, "a court will not interfere with the judgment of a board of directors unless there is a showing of gross and palpable overreaching." *Id.* at 720.

ployed to judge the essential fairness of the transaction.[42]

 Although there was no parent-subsidiary relationship in this transaction, nevertheless MDC held substantial stock interests on both sides of the transaction and we will thus scrutinize it with care. The plaintiff's argued examples of self-dealing on the part of MDC are weak and unpersuasive. Thus, the purpose of keeping "ACI within the MDC group," if beneficial at all, would equally benefit both MDC and Conductron's public stockholders. Likewise, there was no benefit to MDC from the acquisition by avoiding lending ACI money or paying its losses, since there was no legal obligation for MDC to do so in the first place. Actually, as a result of the acquisition, MDC increased its share of ACI's losses from 46 per cent to 80.5 per cent by virtue of its 80.5 per cent stock ownership of Conductron. Evaluation of the transaction under the business judgment standard provides that:

> In the absence of a showing of bad faith on the part of the directors or of a gross abuse of discretion the business judgment of the directors will not be interfered with by the courts.

*Warshaw v. Calhoun*, 221 A.2d 487, 492–3 (Del.1966). It was the finding of the trial court that in the Conductron-ACI transaction there was an absence of "credible proof of improper motives, self-dealing, control, or unfairness, or any benefit to defendants * * *." There is no clear error in such ruling and no violation of Delaware law under either the intrinsic fairness test or the business judgment rule.

Plaintiff also charges, with respect to the ACI transaction, as follows: "The forced acquisition of ACI also violated Section 10(b) of the Securities Exchange Act since it was effected by forcing Conductron to buy securities—the ACI stock." Without stating in so many words, we glean from the two cases cited by plaintiff in support of this argument, *Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6, 10–11, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); *Travis v. Anthes Imperial Ltd.*, 473 F.2d 515, 527 (8th Cir. 1973), that plaintiff's reliance is upon the settled proposition of law that deceptive practices "touching" the sale of securities is sufficient to invoke the "in connection with" clause of Rule 10b–5.[43] In *Superintendent of Insurance, supra*, the defendants had caused the corporation they controlled to sell securities at full value in order to subvert the proceeds of the sale to their personal benefit. *Travis* involved self-dealing in "violation of a fiduciary obligation to minority shareholders".[44] We have no quarrel with these cases but neither is apposite. In the instant case, the District Court found, and we have affirmed, that the ACI acquisition did not involve self-dealing or unfairness to the minority shareholders.

 In sum, the ACI acquisition, which we have found to be a fair transaction, involved no "manipulative or deceptive device or contrivance" in violation of § 10(b) of the 1934 Act.

The plaintiff also asserts a derivative claim arising out of the Siegel and Olsen "insider" sales of Conductron stock in 1967.

Siegel, as noted *supra*, founded Conductron in 1960 and served as its President and Chairman of the Board. He continued in these positions after MDC acquired control of Conductron in 1966, after which Siegel was the largest minority stockholder. He remained in these positions until January 30, 1967, at which time he became involved in a policy dispute with James S. McDonnell, Chairman of the Board of MDC, involving the Hoffman Electronics

---

**42.** "The results of the cases suggest that the difference between the two standards is not significant * * *." Brudney & Chirelstein, *Fair Shares in Corporate Mergers and Takeovers*, 88 Harv.L.Rev. 297, 318 n. 49 (1974). However, as appears from notes 39 and 40, *supra*, there is a significant difference, as a practical matter, in burden of proof.

**43.** *Superintendent of Insurance, supra*, 404 U.S. at 12–13, 92 S.Ct. 165.

**44.** 473 F.2d at 527.

Company,[45] and the acquisition of ACI. Siegel ultimately voted against the acquisition of ACI. This was, in fact, not a particularly significant issue at the time since only approximately $160,000 in Conductron stock was involved, this representing about .01 per cent of Conductron's outstanding shares.

Because of and at the time of the dispute over Hoffman and ACI, Siegel resigned as Chairman, President, and Director of Conductron and informed Mr. McDonnell that he intended to dispose of all of his stock of Conductron, which he did in February of 1967. On February 8, 1967 Siegel incorporated K.M.S. Industries, Inc., which company he operated until his death.[46] Immediately following the K.M.S. incorporation, Siegel invested in stocks of and loans to that company of approximately $2,600,000 of profits from the sale of his Conductron stock.

Olsen's association with Conductron commenced in 1961, when he became the corporation's chief financial officer, a Vice-President, and a director. After Siegel's resignation in 1967, Olsen became head of the Company, but only on a temporary basis, since he did not have the technical background for permanent presidency of a research and development company. On April 27, 1967, a Mr. Burke was elected President of Conductron, although Olsen remained as an officer and director until October 21, 1967. His purpose in then leaving was to join Siegel in Siegel's K.M.S. Industries, it having been agreed during the summer of 1967 that he would be released from his employment contract with Conductron. During the summer he disposed of his Conductron stock and invested the proceeds in K.M.S. Industries. On October 21, 1967 Olsen left Conductron and immediately became an officer and director of K.M.S. Industries.

It is not controverted that in view of the fact that Conductron was a Delaware corporation we are controlled by Delaware law. The problem of "insider" sales has a vast literature [47] and is subject to varying conclusions in the various jurisdictions,[48] a not surprising situation in view of the widely accepted principle applied in such cases that "each case of so-called breach of fiduciary duty must be decided on its own facts", as held by the Delaware Court in *Kors v. Carey*, 39 Del.Ch. 47, 158 A.2d 136, 141 (1960), or, as alternatively put by the Delaware Court in *Equity Corp. v. Milton*, 42 Del.Ch. 425, 213 A.2d 439, 442 (1965), *aff'd*, 43 Del.Ch. 160, 221 A.2d 494 (1966):

> The question of whether or not a corporate fiduciary has appropriated for himself something that in fairness should belong to his corporation is " * * * a factual question to be decided by reasonable inference from objective facts": *Guth v. Loft, Inc.* [23 Del.Ch. 255, 5 A.2d 503], cited in *Johnston v. Greene*, 35 Del.Ch. 479, 121 A.2d 919.

Leading cases in the area are those of the New York Court in *Diamond v. Oreamuno*, 24 N.Y.2d 494, 301 N.Y.S.2d 78, 248 N.E.2d 910 (1969) and the Delaware Court in *Brophy v. Cities Service Co.*, 31 Del.Ch. 241, 70 A.2d 5 (1949).[49] The Third Circuit in *Thom-*

---

**45.** Plaintiff's derivative claim at trial relating to Conductron's failure to acquire Hoffman Products was abandoned on appeal.

**46.** Siegel died after trial, but prior to judgment. By order of the District Court, Ruth B. Siegel, Siegel's wife and executrix, was substituted as a defendant.

**47.** *See, e. g.*, Conant, *Duties of Disclosure of Corporate Insiders Who Purchase Shares*, 46 Cornell L.Q. 53 (1960); Note, *Common Law Corporate Recovery for Trading on Non-Public Information*, 74 Colum.L.Rev. 269 (1974); Note, *Regulation of Insider Trading on the Open Market: A Re-evaluation of Diamond v.*

*Oreamuno*, 9 Ga.L.Rev. 189 (1974); Note, *From Brophy to Diamond to Schein: Muddled Thinking, Excellent Result*, 1 J.Corp.L. 83 (1975).

**48.** *See* 3A W. Fletcher, *Cyclopedia of the Law of Private Corporations* §§ 1167–1168.2 (rev. perm.ed.1975).

**49.** "The acquisition of its own capital stock is not ordinarily an essential corporate function, [citations omitted] and in the absence of special circumstances, corporate officers and directors may purchase and sell its capital stock at will, and without any liability to the corporation." *Brophy*, *supra*, 70 A.2d at 8.

as v. Roblin Industries, Inc., 520 F.2d 1393, 1397 (1975), analyzing both cases, stated that:

> We read both *Diamond* and *Brophy* to stand for the same fundamental proposition: as a matter of common law, a fiduciary of a corporation who trades for his own benefit on the basis of confidential information acquired through his fiduciary position breaches his duty to the corporation and may be held accountable to that corporation for any gains without regard to whether the corporation suffered damages as a result of the transaction. This obligation continues even after termination of the relationship which created the fiduciary duty.

So much for the "fundamental proposition." But in its application thorny questions arise, e. g., was "inside" information in fact relied upon, or were the essential facts, or reasonable inferences therefrom, matters of public knowledge? The facts in the *Brophy* case, *supra*, compared with those presented to us, bring into sharp relief the essential differences in the cases and the ground upon which the claims must be rejected. In *Brophy* it was alleged that the defendant, a confidential secretary to a corporate officer and director, took advantage of his advance knowledge that the corporation was about to purchase shares of its own stock on the open market in such quantities as to cause a rise in its price. It was further alleged that defendant thereupon purchased company stock at a low price, which he subsequently sold at a profit. The complaint was held to state a cause of action. In short, the entire transaction by the officer was entered into, and consummated, on the basis of, and because of, the inside information known secretly to him.

> [T]here can be no justification for permitting officers and directors * * * to retain for themselves profits which, it is alleged, they derived solely from exploiting information gained by virtue of their inside position as corporate officials.

*Diamond v. Oreamuno, supra*, 24 N.Y.2d at 498–99, 301 N.Y.S.2d at 81, 248 N.E.2d at 912. The Restatement (Second) of Agency § 388, Comment c, expresses the same view:

> *Use of confidential information.* An agent who acquires confidential information in the course of his employment or in violation of his duties has a duty * * to account for any profits made by the use of such information, although this does not harm the principal. * * * So, if [a corporate officer] has "inside" information that the corporation is about to purchase or sell securities, or to declare or to pass a dividend, profits made by him *in stock transactions undertaken because of his knowledge are held in constructive trust for the principal.* [Emphasis ours.]

In the case at bar defendant Siegel sold his stock in Conductron and withdrew from the company because of a policy dispute with Mr. McDonnell. He sold his stock as a result of such withdrawal and to obtain funds for his new corporation. His associate, Mr. Olsen, followed him out of Conductron and into Siegel's new corporation because of the desirability of the association, selling his Conductron stock and investing in Siegel's newly formed corporation as a part of his resignation from Conductron and his new association.

The trial court, having taken voluminous testimony, both oral and written, concluded that "neither Siegel nor Olsen violated any fiduciary duty owing to Conductron," and that "[t]here is no evidence whatever that either of them [Siegel or Olsen] wrongfully used inside information, dealt fraudulently with Conductron or seized a corporate opportunity for their benefit. They were not unjustly enriched in fact or in law." There is no clear error in such holding.

Now to consider the 1971 merger of Conductron into the McDonnell Douglas Electronics Co. (MDEC) in 1971. The plaintiff describes it, somewhat pejoratively as a "freeze-out."[50] What is thus characterized

---

50. "The term has come to imply a *purpose* to force a liquidation or sale of a stockholder's

shares, not incident to some other wholesome business goal." Vorenberg, *Exclusiveness of*

is the process by which companies, for a variety of reasons, seek to abandon the public market and return to private ownership, *i. e.,* the process of "going private." [51] The techniques employed vary with the corporate situation presented:

> Reduction of public ownership is most commonly effected by a cash or debt tender offer by the corporation to its public shareholders, or to the public shareholders of a subsidiary corporation. Of course it is rare for all offerees to accept such an offer. Complete elimination of public ownership therefore generally requires that the controlling stock interest, if not already held by an operating parent corporation, be placed in a new corporation. The subsidiary can then be merged into, or its assets conveyed before or after dissolution to, its parent corporation on terms which give the subsidiary's remaining public shareholders cash or debt securities in exchange for their equity. Alternatively, public ownership may be eliminated in one fell swoop by a simple merger or asset conveyance. And, on occasion, it has also been eliminated by the use of a massive reverse stock split, converting all public holdings into fractional interests which are then paid off in cash.[52]

The benefits to the corporation are varied:

> Freedom from worry about the impact of corporate decisions on stock prices; ability to take greater business risks than those sanctioned by federal securities agencies; a switch to more conservative accounting, resulting in lower taxes; the savings which result from no longer having to prepare, print and issue the myriad

of documents required under federal and state disclosure laws; the removal of a pressure to pay dividends at the expense of long-term capital development or speculative capital investment—these are some of the advantages which may enure to a corporation "going private". It is essential to underscore that *all* of the above-stated advantages accrue from the *very act of eliminating the 10% shareholders who confer public status on the corporation.*[53]

Per contra, it is clear that the situation is fraught with opportunities for abuse by the majority. Thus there may be the complete absence of any "legitimate business purpose" in the merger, it being merely a device for the aggrandizement of the dominant stockholder or group at the expense of the minority. Speaking of such, the Supreme Court said, in *Pepper v. Litton,* 308 U.S. 295, 311, 60 S.Ct. 238, 247, 84 L.Ed. 281 (1939):

> He [the dominant stockholder or majority] cannot violate rules of fair play by doing indirectly through the corporation what he could not do directly. He cannot use his power for his personal advantage and to the detriment of the stockholders and creditors no matter how absolute in terms that power may be and no matter how meticulous he is to satisfy technical requirements. For that power is at all times subject to the equitable limitation that it may not be exercised for the aggrandizement, preference, or advantage of the fiduciary to the exclusion or detriment of the *cestuis.* Where there is a violation of those principles, equity will undo the wrong or intervene to prevent its consummation.

---

the Dissenting Stockholder's Appraisal Right, 77 Harv.L.Rev. 1189, 1192–3 (1964) (emphasis original; footnote omitted).

**51.** This expression describing the transaction, taken from the financial press, has been widely adopted by legal commentators. *See* Comment, *The Second Circuit Adopts a Business Purpose Test for Going Private: Marshel v. AFW Fabric Corp. and Green v. Santa Fe Industries, Inc.,* 64 Calif.L.Rev. 1184 (1976). Alternatively, the more neutral expression "takeout" has been employed in the literature. *See,*

e. g., Borden, *Going Private—Old Tort, New Tort or No Tort?,* 49 N.Y.U.L.Rev. 987, 989 (1974).

**52.** Borden, *supra* note 51, at 978–88 (footnotes omitted).

**53.** Judge Moore, dissenting in *Green v. Santa Fe Industries, Inc.,* 533 F.2d 1283, 1308 (2d Cir.), *cert. granted,* 429 U.S. 814, 97 S.Ct. 54, 50 L.Ed.2d 74 (1976) (emphasis original; footnote omitted).

What we are actually called upon to weigh, in these competing considerations in the merger situation, is the interest of the minority in continued stock ownership in the corporation, as against the need for corporate flexibility, which may be exercised, of course, for valid purposes as well as invalid.

The questions before us have been the subject of extensive and learned discussions by the commentators.[54] Many of the "authorities" cited to us have been holdings upon the pleadings, not on the facts. At bar we go beyond the allegations in the pleadings. There has been an exhaustive examination at trial of the various allegations made in the light of facts proven.

The attacks of the plaintiff on the 1971 merger are concentrated in Counts IV and V, containing direct and derivative claims, Count IV alleging statutory violations under the 1934 Act, Count V charging breach of fiduciary duties.

False and misleading statements are charged to be contained in the Consent Statement, issued for purposes of merger, plaintiff invoking both sections 10(b) and 14(a) of the 1934 Act with respect thereto. The individual claims of the plaintiff thereunder were dismissed on the ground of lack of causal relationship.[55] In addition, plaintiff asserts that the 1971 merger was a "freeze-out," violating section 10(b) of the Act as being without a legitimate corporate purpose, and also that even assuming a legitimate corporate purpose, "the manner in which the freeze-out was accomplished and the exchange ratio [56] established constituted an independent violation of Section 10(b)." In addition it was charged under Delaware law that the terms of the merger were unfair, and that action by a majority stockholder having as its primary purpose the "freezing out" of a minority interest is unlawful regardless of the fairness of the price involved.

We view the charges in the light of the economic situation as disclosed in the record. There is no doubt that Conductron was in danger of imminent financial collapse.[57] In 1967 and 1968 Conductron in-

---

54. See Borden, *supra* note 51; Brudney, *A Note on "Going Private"*, 61 Va.L.Rev. 1019 (1975); Vorenberg, *supra* note 50; Note, *Going Private*, 84 Yale L.J. 903 (1975).

55. The trial court, noting that 80% of Conductron's stock was held by MDC, which, of course, could have effectuated the merger without minority approval, found that the causal relationship required under sections 10(b) and 14(a) was lacking and thus dismissed plaintiff's individual claims for violations of such sections. The court relied on *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 385, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), however footnote 7 of *Mills* left open the issue before us. Plaintiff argues that its position is upheld by the reasoning of the Second Circuit in *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374 (2 Cir. 1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975), *commented upon in* 63 Calif.L.Rev. 563 (1975); 4 Brooklyn L.Rev. 1279 (1976). But in view of the holding below that neither Conductron nor its shareholders have suffered damage from the merger, it would be an academic exercise, which we will not undertake, to determine whether or not on these facts the causation requirement is satisfied.

56. The term has been defined as "the ratio of the number of surviving corporation's shares a stockholder of the disappearing entity receives to the number of disappearing company's shares he surrenders." 5 A. Jacobs, *The Impact of Rule 10b–5* § 116:06, at 5–28 n.3 (1974) (footnote ours).

57. Judge Higginbotham, E.D.Pa., ruling upon plaintiff Polin's prayer to enjoin the proposed 1971 merger:

Recognizing that Conductron may be near the brink of financial collapse unless it is assured additional financial assistance, it may be impossible to make an immediate resolution of this controversy which is flawlessly fair—or even satisfactory—in every aspect to each party—the plaintiff, Howard Polin, the other approximately 2600 minority shareholders of Conductron, the 2761 employees of Conductron, and MDC. There are certainly many compelling arguments in plaintiff's favor. But the final and crucial reality before me is that preventing the 1971 merger from proceeding will substantially increase the likelihood of the financial collapse and ultimate bankruptcy of Conductron. The demise of Conductron would harm not only the present employees and other minority shareholders of Conductron but also make impossible the rescission which plaintiff claims he is ultimately entitled to (and for which he seeks the present injunction as the first necessary step in its attainment). Therefore, I find that upon weighing the to-

curred large losses;[58] by the end of 1968, Conductron's net worth had dwindled to $1,782,501.[59] In 1969, Conductron's financial position continued to worsen. Its net loss in 1969 was $21,203,258. As of December 31, 1969, Conductron had a net asset deficiency of $19,410,585 and its indebtedness to MDC was $30,950,000. Further evidence of Conductron's dire financial condition is found in the cross-examination of Mr. George S. Roudebush, Vice President and General Counsel of MDC and a director of Conductron until the 1971 merger:

Q In fact, for the past three or four years prior to January of 1971, every loan made by Conductron from a commercial lending institution, such as banks, had to be endorsed without reservation or restriction by McDonnell-Douglas, did it not?

A Yes, for a certain period that I'm not quite sure how long, but two or three years, anyway.

Q And is it your understanding Conductron, with its own assets and resources, had zero credit?

A Correct.

By December 31, 1970, Conductron had a net asset deficiency of $16,068,997 and a $12,055,871 deficiency in net working capital. It had no source of funds available for financial rehabilitation. Owning over 80 per cent of Conductron's stock, MDC had, in the past, made substantial loans to Conductron[60] but was unwilling to extend itself further. MDC considered bankruptcy for Conductron, but it was rejected because of the adverse attendant publicity, of its effect upon "the welfare of 3,000 human beings who are at work over in St. Charles, Missouri," and its consequences for the minority shareholders. Conductron was, in fact, in dire financial straits, only existing be-

cause of MDC's advances, its countersignature on contracts and its furnishing of payroll funds for the employees. "Nobody would do business with us," testified Mr. David C. Arnold, Conductron's last president.

As for aid through cancellation of Conductron's indebtedness to MDC, such aid was rejected because of the interests and position of MDC's own stockholders. Recapitalization through the issuance of additional Conductron shares was not realistic, since there were grave doubts that such would have any market. In view of its large investment in Conductron, MDC was unwilling to go further in this direction without complete, 100%, ownership of Conductron.

Accordingly, the merger plan was devised. Under its terms, MDEC, a Delaware corporation, was to be formed, with all its issued and outstanding shares to be owned by MDC. This latter corporation would then issue 135,474 shares of its common to MDEC, to be delivered, under the terms of the merger agreement, to the shareholders of Conductron, other than MDC. The separate corporate existence of Conductron was to cease at the time the merger became effective. A Consent Statement, concerning which complaint is made, described the merger agreement and was sent to all Conductron shareholders, but we note that under Delaware law, MDC itself, owning 80.5 per cent of Conductron shares, had sufficient holdings to approve the merger without additional shareholder approval.

The preliminary agreement between McDonnell Douglas and Conductron made on 11 January 1971 provided that the exchange ration would be based either on the average of the market prices of Conductron and McDonnell Douglas stock for

---

tality of factors, the balance preponderates against the issuance of the preliminary injunction, even though admittedly my decision is not free from all doubt.

**58.** Conductron's net loss was $6,054,507 in 1967 and $4,869,641 in 1968.

**59.** At the close of 1966, Conductron's net worth was $12,148,012.

**60.** As of May 7, 1971, the amount outstanding was $17 million. MDC had also made grants to Conductron for research and development in the sum of $12 million, which grants were not required to be repaid. The products of such research and development were to be the property of Conductron.

one month ending 11 January, the market prices on 11 January, or the book values on 31 December 1970, whichever was most favorable to the public holders of Conductron stock.[61]

The merger ration was based on the January 11th market prices of $6.20 per share for Conductron and $23.81 per share for MDC, such date being the most favorable to the public shareholders of Conductron. Thus, there was an exchange of .27 shares of MDC stock for each share of Conductron. MDC shares, having a cash value of some $3 million were paid to Conductron public shareholders for their stock. The merger was consummated on May 28, 1971 and in 1972 MDEC's separate corporate existence was terminated, MDEC becoming a division of MDC. The private shareholders of Conductron, rather than being bought out, became shareholders in MDC.

The cases passing upon the validity of mergers having the effect of eliminating the private shareholders agree on one basic proposition, namely, that the presence or absence of a legitimate business purpose for the merger is of critical importance in appraising the bona fides of the transaction.[62] This factor we find stressed in *Green v. Santa Fe Industries, Inc., supra,* 533 F.2d at 1291, which held that a claim is stated under Rule 10b–5, when it charges "that the majority has committed a breach of its fiduciary duty to deal fairly with minority shareholders by effecting the merger without any justifiable business purpose", and in *Bryan v. Brock & Blevins Co.,* 490 F.2d 563, 570 (5th Cir.), *cert. denied,* 419 U.S. 844, 95 S.Ct. 77, 42 L.Ed.2d 72 (1974):

> [T]he trial court found the absence of a "business purpose" for the proposed merger * * *. In the absence of such business purpose Power Erectors was purely a sham party created to circumvent the rule of law that prohibits a majority of stockholders of a corporation, * * * to force the minority interests to surrender their stock holdings.[63]

Among other bona fide business reasons,[64] imminent financial collapse has

---

**61.** Consent Statement, p. 4.

**62.** Earlier case law was more restrictive. Thus we find in *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461, 464 (2d Cir.), *cert. denied,* 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), that § 10(b)

> was directed solely at that type of misrepresentation or fraudulent practice usually associated with the sale or purchase of securities rather than at fraudulent mismanagement of corporate affairs * * *.

The scope of Rule 10b–5 has now been extended beyond the narrow limits of *Birnbaum* and similar cases. *See Superintendent of Insurance v. Bankers Life & Casualty, supra; Affiliated Ute Citizens v. United States,* 406 U.S. 128, 152–53, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972) wherein it was held, the Court finding present misrepresentations as well as a fraudulent scheme:

> To be sure, the second subparagraph of [Rule 10b–5] specifies the making of an untrue statement of a material fact and the omission to state a material fact. The first and third subparagraphs are not so restricted. These defendants' activities * * * disclose, within the very language of one or the other of those subparagraphs, a "course of business" or a "device, scheme or artifice" that operated as a fraud upon the * * * sellers.

**63.** *See also Marshel v. AFW Fabric Corp.,* 533 F.2d 1277, 1282 (2d Cir.), *vacated and remanded for consideration of mootness,* 429 U.S. 881, 97 S.Ct. 228, 50 L.Ed.2d 162 (1976):

> The controlling shareholders of Concord have devised a scheme to defraud their corporation and the minority shareholders to whom they owe fiduciary obligations by causing Concord to finance the liquidation of the minority's interest with no justification in the form of a valid corporate purpose[;]

Vorenberg, *supra* note 50, at 1204:

> [O]nly where there is a *plausible business purpose of the corporation* beyond the majority's desire to enlarge their own stockholdings or to eliminate a minority stockholder should the minority holder be required to choose between what is available to him as a result of the action proposed by the majority and the cash value of his shares[;] [Emphasis original.]

Borden, *supra* note 51, at 1001; Comment, 64 Calif.L.Rev. 1184, 1207–16, *supra* note 51.

**64.** *See Grimes v. Donaldson, Lufkin & Jenrette, Inc.,* 392 F.Supp. 1393, 1402 (N.D.Fla.1974), *aff'd mem.,* 521 F.2d 812 (5th Cir. 1975), wherein the court found the following to be valid business reasons for a merger: (1) The two corporations involved were engaged in similar businesses making merger "a logical proposition;" (2) The elimination of potential claims of conflict of interest inhibiting business dealings

been a long-recognized justification for a take-out. Thus in *Matteson v. Ziebarth*, 40 Wash.2d 286, 242 P.2d 1025 (Wash.1952) (en banc), the failing Ziebarth Corporation located another concern willing to continue the business of the corporation under a license agreement, but only if it received an option to purchase all Ziebarth stock, against the wishes of one Matteson who owned an 11 per cent stock interest. In addition to other reasons for upholding the merger transaction, the court stressed that "[t]here was good reason to believe that this option contract was the only salvation for the hard-pressed Ziebarth Corporation" and distinguished an earlier case holding a merger to be fraudulent on the ground that the merger in that case was "not for any *bona fide* business reason, but for the sole purpose of getting rid of a disagreeable stockholder who refused to sell his stock * * *." *Id.* at 301, 242 P.2d at 1034–35 (emphasis original).

▉ In the case at bar it is abundantly clear that the merger was required by the danger of the imminent collapse of Conductron. There is no serious question but that there was a legitimate business reason for the merger. There is thus no violation of section 10(b) of the Securities Exchange Act, or of the Delaware law. Plaintiff's argument that "[l]acking any legitimate corporate purpose, the MDC defendants simply forced out the minority in 1971 to realize the benefits that flowed to them from that course * * * [in] clear violation of Delaware law," is not supported by the facts before us.

But plaintiff continues, as we have noted *supra*, that "[e]ven assuming that the 1971 transaction had a legitimate corporate purpose, the manner in which [it] was accomplished and the exchange ratio established constituted an independent violation of Section 10(b)." In connection with this charge, plaintiff asserts self-dealing by MDC, in violation of its fiduciary duties to Conduc-

tron's minority shareholders with respect to the 1971 merger.[65] Plaintiff also contends that the District Court erred in finding the terms of the 1971 merger to be fair and equitable. Plaintiff's attack on the District Court's finding of fairness, consists, in large measure, of the same charges of self-dealing which he argues constitute a violation of § 10(b) without regard to the legitimacy of the corporate purpose of the 1971 merger. Specifically, plaintiff charges that MDC decided in late 1969 on a merger with Conductron, but waited until January, 1971, when Conductron's stock had fallen to an artificially low price, to implement that plan. In substance, plaintiff charges that the alleged artificially low price of Conductron stock was the result of MDC actions; chiefly, causing Conductron to refrain from filing a lawsuit against Lockheed, and procuring the delisting of Conductron stock from the American Stock Exchange ("AMEX").

With respect to these charges the record is clear that MDC had not yet decided in 1969 on a merger with Conductron. Alternatives, such as recapitalization and bankruptcy, were given serious consideration but rejected, as noted above.

Conductron's 1969 financial statement recognized a loss of approximately $21 million, attributable to its writing off a claim against Lockheed arising out of deficient and delinquent engineering data and aircraft parts furnished to Conductron. Suit against Lockheed had been contemplated. The Chairman of Lockheed's board, Mr. Haughton, upon learning of the possible lawsuit, requested a delay pending a sincere effort by both parties to reach agreement. Such was done and settlement was reached in September, 1970, for a net amount of $6 million, recorded as income in Conductron's 1970 financial statement, and the loss written off in the exercise of reasonable business judgment. The record discloses no im-

---

between the two corporations; and (3) Savings in daily operations amounting to more than $300,000 per year.

**65.** We have held that self-dealing in violation of a fiduciary obligation to minority shareholders in connection with a sale or purchase of securities is actionable under § 10(b). *Travis v. Anthes Imperial Ltd., supra,* 473 F.2d at 527.

propriety in the handling of this claim against Lockheed, or in the accounting therefor.[66] Plaintiff also charges that MDC knew in 1969 that Conductron stock would be delisted by the AMEX and that MDC helped to bring about that delisting primarily by writing off the full amount of the Lockheed claims in 1969, and deliberately waited until the delisting of Conductron's stock before implementing the merger.

The AMEX halted trading in Conductron stock on November 11, 1970, and shortly thereafter delisted Conductron stock on account of the corporation's poor financial condition. Prior to the delisting, the AMEX held a hearing, at which Mr. Arnold, the President of Conductron made a presentation. Mr. Arnold testified that at the hearing "I ran through all of the things that we were doing in the company to stop the losses. * * * I tried to do a selling job on them so that even though we didn't meet the requirements of staying listed, that they would leave us on the exchange, but it didn't work."

Delisting followed. We have been cited to no evidence in the record, nor does our own examination thereof reveal that the claim against Lockheed was written off with a view towards procuring the delisting of Conductron's stock by the AMEX.

The much-argued merger, in our judgment, was for a justifiable business purpose, there was no precipitous action taken, and the terms thereof were neither unfair nor violative of any fiduciary duty. As the trial court held

> In our judgment, the credible evidence does not support plaintiff's claim of an ulterior purpose or scheme to freeze out the minority shareholders. Conductron's

problems resulted from a myriad of factors, not the least of which was the national depression, particularly in the aerospace industry. We find that the terms of the merger were fair and equitable. 411 F.Supp. at 704.

The court below took testimony at length on. the various issues here presented and concluded that the charges made were without foundation. In so holding we find neither error of law nor clear error of fact.

In the view we have taken of the case we find it unnecessary to pass upon additional issues presented.

Affirmed.

---

**66.** Note D to Conductron's 1969 financial statement disclosed fully the accounting treatment of the claim against Lockheed:

> *Note D—Disputed Contract*
> Divergent interpretations of a contract to produce C–5A aircraft simulators are held by the Corporation and its customer, Lockheed Aircraft Corporation. In December 1969, revised claims totaling approximately $21,000,-000 were submitted to Lockheed to cover all costs, plus earnings, attributable to deficient

and delinquent engineering data and aircraft parts received from Lockheed.

> Inasmuch as negotiations to date have not resulted in contract coverage for these claims, management has elected to charge these claims against current operations. These claims are meritorious in the opinion of counsel, and settlement will continue to be pursued vigorously. Upon final settlement, any recovery will be reflected as earnings in the year of settlement.