411 F.Supp. 698 (1976)
Howard POLIN on behalf of himself and on behalf of all other similarly situated shareholders of Conductron Corporation and derivatively, on behalf of Conductron Corporation, Plaintiff,
v.
CONDUCTRON CORPORATION et al., Defendants.
Nos. 72 C 244(2), 72 C 245(2).
United States District Court, E. D. Missouri, E. D.
January 23, 1976.
*699 *700 Edward F. Mannino, Dilworth, Paxson, Kalish, Levy & Coleman, Harold E. Kohn, Philadelphia, Pa., Robert S. Allen, Lewis, Rice, Tucker, Allen & Chubb, St. Louis, Mo., for plaintiff.
Richmond C. Coburn and John C. Shepherd of Coburn, Croft, Shepherd & Herzog, St. Louis, Mo., Robert V. Seymour and Paul R. Trigg, Jr. of Dykema, Gossett, Spencer, Goodnow & Trigg, Detroit, Mich., for defendants Louis J. Cutrona, R. A. Olsen, Wm. D. Prosnitz, Keeve M. Siegel and Richard D. Mange.
Veryl L. Riddle and Bryan, Cave McPheeters & McRoberts, St. Louis, Mo., for McDonnell Douglas Corp., Conductron Corp. and certain other defendants.
Robert L. Pratter, Duane, Morris & Heckscher, Philadelphia, Pa., for Conductron Corp.
Veryl L. Riddle, St. Louis, Mo., and Donald A. Scott, Philadelphia, Pa., for defendants.

MEMORANDUM OPINION AND ORDER
REGAN, District Judge.
This action filed by Howard Polin, a shareholder of Conductron Corporation, was transferred to this Court from the Eastern District of Pennsylvania.[1]
The consolidated amended complaint charges defendants with various violations of the Securities Exchange Act of 1934 and regulations thereunder as well as with breaches of fiduciary duties owing by them under Delaware law. Basically, the complaint attacks the acquisition by McDonnell Douglas Corporation of a controlling interest in Conductron stock in January, 1966, the operation of Conductron thereafter, and the ultimate merger of Conductron into a wholly owned subsidiary of McDonnell Douglas. Both individual and derivative claims are alleged.
Defendants are McDonnell Douglas Corporation which, since January, 1966, and until the merger owned 80.5% of the capital stock of Conductron and a number of individuals who at various times were officers or directors of either or both Conductron and McDonnell.
Conductron, a Delaware corporation, was an electronics research and development firm in Ann Arbor, Michigan, with sales for the year ending December 31, 1963 of some $5,000,000. McDonnell Aircraft Corporation (which later became defendant McDonnell Douglas Corporation) was a St. Louis-based manufacturer of aircraft and aerospace products with sales for the year ending June 30, 1964 of $865,000,000. In that year it purchased 20% of the outstanding common stock of Conductron, following which defendants Lewis and Roudebush (directors and officers of McDonnell) were elected to Conductron's Board of Directors.
On January 7, 1966, after arms-length negotiations which extended well over a year, McDonnell and Conductron entered into a conditional agreement whereby McDonnell was to acquire 1,850,000 newly issued shares of Conductron stock in return for the business and assets of McDonnell's Electronic Equipment Division, five million dollars cash, and all the capital stock of Tridea Electronics Company, a wholly owned subsidiary of McDonnell. Such acquisition, together with its contemporaneous purchase of 50,000 shares of stock owned by defendant Keeve M. Siegel, would result in McDonnell owning 80.5% of Conductron's outstanding stock, thereby placing it in "control" as that term is defined in the Internal Revenue Code. A Conductron stockholders meeting was called for January 25, 1966, to consider the transaction. *701 Notice of the meeting, together with a proxy statement and a letter from Siegel (its president and principal individual stockholder), was mailed to shareholders at their addresses of record. With Siegel and McDonnell constituting a majority of the voting stock, stockholders' approval was little more than a formality. Following that approval at the January 25 meeting, the transaction was closed on January 27, 1966.
We first consider plaintiff's individual claims. These are based on alleged violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10(b)5 thereunder. The violations consist of allegedly misleading statements and reports made by various defendants, following each of which plaintiff continued his pattern of making additional purchases of Conductron stock. Complained of are the January 12, 1966 proxy statement and the various annual and quarterly earnings reports issued by Conductron thereafter, as well as press releases.
Whether plaintiff actually received and read the various statements and reports is a controverted issue. The credibility of plaintiff is attacked by defendants, and we have concluded that plaintiff has failed to establish by credible evidence that he received and read the documents in question. Complicating the situation is the fact that plaintiff made some 65 separate purchases of Conductron stock prior to filing suit.
It is plaintiff's contention that the proxy statement was fraudulently misleading by reason of alleged omissions of material facts chiefly relating to aircraft simulators and various problems likely to be encountered by Conductron in that business, at least for the first several years. In the light of hindsight, it may well be that the proxy statement was conservative in its estimates as to the future. However, considering the then known facts, it is our view that the projections made in the statement are neither false nor misleading, either by way of affirmative representations or omissions therefrom.
As of the date of the January, 1966 proxy statement, plaintiff was the owner of 200 shares of Conductron stock which he had bought in May, 1965, at an average cost of 23 1/8 per share. On February 18, 1966, plaintiff purchased an additional 400 shares, 100 at 50¾ and 300 at 50 5/8 . No further purchases were made until October 12 (100 shares at 42).
In April, 1966, after McDonnell had acquired its controlling interest, Conductron's 1965 annual report was issued, this being followed in September by its "Annual" report for the six months ending June 30, 1966. As to these and the other reports, it is plaintiff's contention that they too contain omissions of essential facts relating to difficulties likely to be encountered by Conductron, by reason of which they presented a false and misleading picture of Conductron's operations and prospects. After the 1965 and the 1966 Annual reports were issued plaintiff purchased an additional 600 shares of Conductron. The prices paid (in February, 1967) ranged from a high of 58½ to a low of 44¾.
In the latter part of April, 1967, Conductron's "Annual" report for the last six months of 1966 (which included the sales and earnings of the first quarter of 1967) was issued. The reports disclosed very substantial losses which had been incurred in Conductron's aircraft simulator program. Nevertheless, plaintiff continued his purchases, acquiring some 2600 shares prior to the issuance of a press release in January, 1968. Thereafter, before Conductron issued its 1967 annual report in April, 1968 and a press release at that time, plaintiff purchased an additional 500 shares. Then he acquired another 3700 shares of Conductron stock from April, 1968 through December of that year, including 1400 shares which he purchased after correspondence with the then president of Conductron relating to plaintiff's allegations of McDonnell improprieties. In April, 1969, the 1968 annual report was issued. This was after plaintiff had consulted with counsel in March of 1969 concerning the liability of defendants for their alleged fraud. It is also not without *702 significance that as early as December, 1968, plaintiff had complained to the Securities Exchange Commission respecting what he believed to be improper actions of McDonnell Douglas. This was shortly after he had purchased 1900 shares of Conductron stock in September and November of that year.
As we have indicated, we have carefully reviewed each of these reports, as well as the earnings statements and the press releases, in light of plaintiff's complaints and find that none of them are fraudulently misleading either by omissions or by affirmative statements. It is true, of course, that each report painted a gloomier picture of the extent of the losses incurred and anticipated than the preceding one, but there is no substantial basis for the contention that any of the reports withheld material information or fraudulently minimized losses which should have been anticipated.
In view of our holding that plaintiff neither received nor read these reports, he could not have relied thereon in making any purchases of Conductron stock. In truth, the pattern of his acquisitions is difficult to understand from the point of view of reliance on the alleged fraud. Thus, after his initial acquisition of 400 shares in the month after the proxy statement was issued, no purchases at all were made until October 12, 1966, some eight months later, when plaintiff bought 100 shares of stock at 42, down 8 5/8 ths from his earlier purchases. Then, in February of 1967, about four months later, before any other material was issued by Conductron, plaintiff purchased some 400 shares of stock in 100 share lots at prices ranging from 58½ on February 1st to 54 3/8 on February 16th, followed by a fifth 100 share purchase on February 24th at 44¾. No explanation is given of this 10 point drop in an 8-day period. In the two month period commencing September 21, 1967, as the price of the Conductron stock he bought fell from 41 7/8 to 31, plaintiff made nine additional purchases aggregating some 1800 shares. And in the month ending January 16, 1968, when Conductron price was hovering in the mid-thirties, another 800 shares were purchased. In April, 1968, prior to the issuance of the 1967 annual report, plaintiff resumed his purchases with the acquisition of 500 shares, 200 at 29 3/8 and 300 the following week at 31¼. In May, 1968, when the price of the stock was fluctuating between a low of 39¾ and a high of 47½ (in spite of the substantial losses and the prospects of additional losses which Conductron had publicly reported the previous month), plaintiff bought another 1300 shares. In June of that year additional purchases of 500 shares were made, the first lot of 200 at 47 5/8 and the last 300 shares at 41. This pattern of purchases does not, in our judgment, indicate reliance upon any fraudulent representations or omissions.
The basic element of a Section 10(b)5 claim is causation, namely that the alleged fraud resulted in damage. Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). Normally, a case is made when a plaintiff proves an out-of-pocket loss which results from material misrepresentations of facts or fraudulent omissions. Such out-of-pocket loss would be the difference between the purchase price and the actual value of the stock at the time of purchase. To sustain a recovery on this basis the plaintiff must show that the Conductron stock he bought was in fact of less value than the price he paid for it at the time of purchase. Unless the stock purchased is of lesser value than the price paid, then, notwithstanding the falsity of any alleged representation, the purchaser has suffered no loss and is entitled to no damages. Harris v. American Investment Company, 523 F.2d 220 (8 Cir. 1975).
Recognizing this problem and his failure to adduce evidence as to the actual value of the stock at or near the time of his purchases, plaintiff now contends (citing Harris, supra) that damages may be assessed on the basis of the value of the stock at the time the public discovered the alleged falsity of the representations, *703 a rule applied in situations where the stock is publicly traded, as Conductron was. On this theory, too, there is a failure of proof, in view of the absence of evidence both as to some dates upon which the alleged frauds were "discovered" by the public and as to the "actual" value of the stock as of such dates. True, there were fluctuations from time to time in the publicly traded prices of Conductron, but no relationship between these fluctuations and the alleged misrepresentations has been shown. It would appear that the fluctuations in the market price of the stock resulted from factors unrelated to the alleged misrepresentations, and we so find. In our judgment the credible evidence does not justify a finding that the market value of the stock was artificially inflated or deflated by any of the alleged misrepresentations.
We next consider plaintiff's derivative claims. The first of these relates to the aircraft simulator business venture in which Conductron became involved following its acquisition of McDonnell's Electronic Equipment Division. In essence, plaintiff's theory on this claim is that McDonnell, for its own benefit, "forced" Conductron to engage in the aircraft simulator business to the detriment of the interests of its minority stockholders.
Delaware law governs. Plaintiff argues that the applicable test in judging the propriety of defendants' conduct is that of "intrinsic fairness," whereby controlling shareholders or directors of the corporation are held to the same standard of care as the trustee of an express trust, citing Guth v. Loft, 23 Del.Ch. 235, 5 A.2d 503, affirmed 23 Del.Ch. 138, 2 A.2d 225 (1938) and Overfield v. Pennroad Corp., 42 F.Supp. 586 (D.C.Pa.1941). On the other hand, defendants rely on the "business judgment" rule, to the effect that absent a showing of bad faith or a gross abuse of discretion (as to which the complainant has the burden of proof) a court will not second-guess the judgment of a corporation's directors.[2]Warshaw v. Calhoun, 221 A.2d 487 (Del. Supr.1966). Under the facts here involved, we believe the "intrinsic fairness" rule is inapposite.
In the final analysis what plaintiff is contending is that in view of the risks inherent in the business, McDonnell itself should have undertaken the simulator program and thereby, in the likely event it proved unprofitable, sustain 100 per cent of the loss instead of the 80.5 per cent which by reason of its stock ownership it actually sustained. This hindsight approach falls far short of demonstrating any impropriety. It is evident to us that at the time the decisions were made, all of the parties involved, including defendant Siegel, who had most to lose as a minority stockholder, acted in the good faith belief that the simulator venture would ultimately prove profitable and be in the best interests of Conductron. We find no abuse of discretion.
Plaintiff's second derivative claim pertains to the rejection of the proposed acquisition of Hoffman Electronics and Hoffman Products Corporation. He contends that McDonnell and the Conductron directors elected by it breached their fiduciary duties to Conductron by deciding not to consummate the Hoffman purchase. We do not agree. These defendants had sound and legitimate business reasons for opposing the acquisition and acted thereon in good faith and in the exercise of their discretion. True, there was a difference of opinion, as evidenced by defendant Siegel's strong feelings in favor of the purchase, but that is a far cry from substantial proof of impropriety. So, too, the mere fact that the Hoffman companies earned profits in the following years does not make these defendants liable to Conductron for the amount of the profits.
*704 Plaintiff also complains of the acquisition by Conductron of Advanced Communication, Inc. (ACI), a small company engaged in the production of advanced electronic devices. Although McDonnell owned a 46% interest in ACI, it did not "control" that company in fact or in law. Absent, as here, credible proof of improper motives, self-dealing, control, or unfairness, or any benefit to defendants, plaintiff has failed to demonstrate any actionable wrong.
We turn next to plaintiff's claim based on the 1971 merger of Conductron into McDonnell Douglas Electronics Company, a wholly-owned subsidiary of McDonnell. The thrust of the claim is that the merger was the culmination of a scheme to freeze out Conductron's minority stockholders at an inequitable exchange ratio. The first stage of the alleged scheme was to transfer McDonnell's loss operation (the aircraft simulators and ACI) to Conductron with resultant insolvency. The second stage of the alleged scheme was to provide capital to Conductron in the form of loans rather than capital contributions even though Conductron was insolvent and the loans could not be repaid. The final stage of the alleged scheme was to liquidate Conductron at an artificially low price (after taking all possible steps to depress the value of its stock), at a time when defendants knew that Conductron's profit picture for the future was brightening.
In our judgment, the credible evidence does not support plaintiff's claim of an ulterior purpose or scheme to freeze out the minority shareholders.[3] Conductron's problems resulted from a myriad of factors, not the least of which was the national depression, particularly in the aerospace industry. We find that the terms of the merger were fair and equitable.
Remaining for determination are the separate derivative claims against defendants Siegel, Olsen and Cutrona. Plaintiff alleges that these defendants breached their fiduciary duties by authorizing the sale of control of Conductron to McDonnell in 1966. The case principally relied on by plaintiff is Insuran-shares Corporation of Delaware v. Northern Fiscal Corporation, 35 F.Supp. 22 (D.C.Pa.1940). That was a suit "to recover damages incurred by the corporation as a result of the sale of its control to a group who proceeded to rob it of most of its assets." Liability was imposed because the sellers failed, in light of the known surrounding circumstances, to make a reasonably adequate investigation to determine whether control was to be acquired by improper means and for an improper purpose  that is, whether fraud was intended or likely to result. No comparable situation is here involved. McDonnell, the purchaser, enjoyed the highest reputation for financial and business responsibility. The sellers of control carefully investigated the proposal in all its facets and concluded, in the good faith exercise of business judgment, that the transaction would be beneficial to Conductron. Fraud was neither intended nor likely to result from a transfer of control. And significantly, Siegel still owned over 88,000 shares and Olsen and Cutrona retained their stock ownership. No breach of fiduciary duties has been proven.
A further claim asserted against Siegel and Olsen only is that they wrongfully made "insider profits" by selling their Conductron stock while in possession of information not disclosed to the public, and so should be liable to the corporation under Delaware law. The alleged "inside information" relates primarily to the projected losses Conductron would incur in the simulator business and from the acquisition of ACI. We hold that neither Siegel nor Olsen violated any fiduciary duty owing to Conductron.
*705 As for Siegel, what happened is that when he failed to persuade the other members of the executive committee to agree to the Hoffman acquisition, he resigned as president and director, and shortly thereafter (in February, 1967) sold all his Conductron stock, using the proceeds to organize a new company. At that time, he had every reason to believe the simulator business would be successful. As for Olsen who had long been associated in business with Siegel, he remained for a time with Conductron after Siegel left. After negotiating a cancellation of his employment contract he sold his Conductron stock in July, 1967, primarily to purchase stock in Siegel's company with which he later became associated as an officer.
Plaintiff relies upon Brophy v. Cities Service Co., 31 Del.Ch. 241, 70 A.2d 5 (1949). In that case, a corporate insider (the confidential secretary to a corporate director) was held liable to the corporation for the profits he realized on the purchase of stock before public disclosure of the fact that the company intended to purchase a quantity of its shares, a fact which would result in a rise of the market price of the stock. Clearly, in that situation, the insider was profiting at the expense of the corporation. The basis of the decision is that for the purpose of removing temptation to profit from a breach of his confidential relationship, an officer or director of a corporation who, in violation of his duty as such, acquires gain or advantage for himself, is liable to the corporation for the benefit or profit so acquired.
As we view the facts, the Brophy rule is not here applicable. The good faith and proper motivations of Siegel and Olsen is plainly evident. There is no evidence whatever that either of them wrongfully used inside information, dealt fraudulently with Conductron or seized a corporate opportunity for their benefit. They were not unjustly enriched in fact or in law.
The foregoing memorandum constitutes our findings of fact and conclusions of law. Judgment will be entered in favor of defendants and against plaintiff on all counts.
NOTES
[1] Originally, there were two suits involving different aspects of Polin's claims, maturing at different times. Both of these suits were transferred to this district. By order of court, they were consolidated into one action for all purposes. Thereafter plaintiff filed a consolidated amended complaint embodying the claims in both actions.
[2] Plaintiff also contends that even under the business judgment rule defendants should be held liable for at least 18 millions of the 54 million dollars loss which Conductron ultimately incurred in the aircraft simulator business. As appears infra, we hold otherwise.
[3] It is interesting to note that on the one hand plaintiff contends that defendants kept the stock at an artificially inflated level (by means of material misrepresentations and omissions) and on the other hand argues that they forced the market price down in furtherance of the alleged freeze-out scheme.