Rosemary L. UMBRIAC, as Executrix of an estate and as a representative of a class and of Kaiser Industries, Catherine A. Lyman, as Executrix of an estate and as a representative of a class and of Kaiser Industries, Alice J. Lyman, as Executrix of an estate and as representative of a class and of Kaiser Industries, and Cletus P. Lyman, as Executor of an estate, Plaintiffs,

v.

Edgar F. KAISER, Individually, and as liquidating trustee of Kaiser Industries and as trustee of The Henry J. Kaiser Family Foundation ("Kaiser Foundation"), William R. Roesch, Individually, and as a liquidating trustee of Kaiser Industries, George E. Link, Individually, and as a liquidating trustee of Kaiser Industries, Lloyd N. Cutler, Individually, and as a trustee of Kaiser Industries, Walter A. Rosenblith, Individually, and as a liquidating trustee of Kaiser Industries, Roger W. Heyns, Individually, and as a liquidating trustee of Kaiser Industries, James N. Land, Jr., Individually, and as a liquidating trustee of Kaiser Industries, James K. Parker, Individually, and as a liquidating trustee of Kaiser Industries, George L. Farinsky, Individually, and as a liquidating trustee of Kaiser Industries, E. E. Trefethen, Jr., S. A. Girard, P. S. Hass, Edgar F. Kaiser, Jr., Individually, and as trustee of the Kaiser Foundation, Cornell C. Maier, James F. McCloud, George A. Jedenoff, George D. Woods, as trustee of the Kaiser Foundation, Robert J. Glasser, as trustee of the Kaiser Foundation, Kingman Brewster, Jr., as trustee of the Kaiser Foundation, W. L. Hadley Griffin, as trustee of the Kaiser Foundation, Robert D. Haas, as trustee of the Kaiser Foundation, Henry M. Kaiser, as trustee of the Kaiser Foundation, Kim J. Kaiser, as trustee of the Kaiser Foundation, Girard Piel, as trustee of the Kaiser Foundation, The Henry J. Kaiser Family Foundation, a California Charitable Trust, and The First Boston Corporation, a Massachusetts Corporation, Defendants,

Kaiser Industries Corporation, a Nevada Corporation, Nominal Defendant.

Civ. No. R–77–0071 BRT.

United States District Court, D. Nevada.

March 27, 1979.

Breen, Young, Whitehead & Hoy, Chartered, Reno, Nev., Cletus P. Lyman, Philadelphia, Pa., Richard A. Westin, Calais, Vt., for plaintiffs.

Woodburn, Wedge, Blakey & Folsom, Reno, Nev., John R. Hupper, New York City, Andrew P. Tashman, New York City, for defendants, Edgar F. Kaiser, George E. Link, Lloyd N. Cutler, Walter A. Rosenblith, Roger W. Heyns, James N. Land, Jr., James K. Parker, George L. Farinsky, S. A. Girard, P. S. Hass, James F. McCloud, George A. Jedenoff, E. E. Trefethen, Jr., Edgar F. Kaiser, Jr., Cornell C. Maier and William R. Roesch.

McCutchen, Doyle, Brown & Enerson, Gordon M. Weber, Graham B. Moody, Jr.,

Boake Christensen, San Francisco, Cal., for defendants, Robert J. Glasser, as trustee of the Kaiser Foundation, W. L. Hadley Griffen, as trustee of the Kaiser Foundation, Robert D. Haas, as trustee of the Kaiser Foundation, Kim J. Kaiser, as trustee of the Kaiser Foundation, Girard Piel, as trustee of the Kaiser Foundation, and Henry J. Kaiser Family Foundation, a California charitable trust.

## ORDER

BRUCE R. THOMPSON, District Judge.

This suit for damages and injunctive relief arises out of the adoption by the shareholders of Kaiser Industries Corporation ("KIC") of a plan of liquidation. The plaintiffs concede and the undisputed facts show that the liquidation plan, as adopted and implemented, has benefited KIC stockholders, nearly doubling the value of their holdings.[1] However, the plaintiffs contend that even more favorable results could have been accomplished had an alternative plan of liquidation been pursued. The Second Amended Complaint couches this contention in terms of an alleged violation of the truth-in-proxy provisions of section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n. Thus it is alleged that the proxy materials soliciting shareholder approval of the plan of liquidation were materially misleading in their failure to discuss either the plaintiffs' proposed alternative plan or, at a minimum, certain facts that allegedly would have alerted shareholders to the possibility that management was blind to its existence. To their Securities Exchange Act claims plaintiffs have appended state law claims charging the KIC Directors with breach of their fiduciary duties. The matter is before this Court on defendants' motion to dismiss or, in the alternative, for summary judgment.

Some background is necessary to an understanding of this suit. The following are undisputed facts: Before liquidation KIC was one of the nation's 250 largest industrial companies. Chief among its assets was its portfolio, comprising substantial stockholdings in three, publicly-traded Kaiser Affiliates. Its common stock ownership amounted to 56.3% of Kaiser Steel Corporation, 37.4% of Kaiser Aluminum & Chemical Corporation, and 37.1% of Kaiser Cement & Gypsum Corporation. Based on December 31, 1976 market quotations, these holdings had values of $126,849,000, $268,716,000 and $22,289,000, respectively. KIC also owned several large businesses: Kaiser Engineers, a world-wide engineering business which has since been sold for $30,500,000; Kaiser Broadcasting Corporation, which has been sold for a base price of $42,625,000 in cash, subject to contingent additional payments of up to $11,828,000; Kaiser Aerospace & Electronics Corporation, which has been sold for $13,793,000; and Kaiser Sand & Gravel, an unincorporated division of KIC, which has been sold for approximately $21,500,000, subject to a retained leasehold in KIC. In addition, KIC owns 50% of National Steel & Shipbuilding Co., a company with a backlog of construction orders of $554,000,000 as of December 31, 1976, and 25% of Kaiser Center, Inc., a corporation which owns the Kaiser Building in Oakland, California.

Despite the size and diversity of KIC's assets, its common stock historically sold at substantial discounts. In 1974 and 1975, for example, KIC stock traded at prices 32% lower than the then per share market value of the portfolio stocks, without even counting the non-portfolio assets. In addition, 15% of the dividends paid KIC by the Kaiser Affiliates were being subjected to dou-

---

1. In the week preceding the announcement of the plan of liquidation, KIC stock was trading at prices ranging from $11.00 to $11.63 per share. Since approval of the plan of liquidation, KIC stockholders have received portfolio stocks valued at distribution at $13.30 per KIC share, plus $5.00 per share in cash, and they continue to hold KIC shares trading at over $2.00 per share, for an aggregate realization of more than $20.30 per share.

ble taxation, once at the corporate level and again upon distribution to KIC stockholders. To eliminate these and other problems KIC had for several years been exploring various ways to modify its financial structure. On May 5, 1976 the KIC Directors publicly announced their intention of submitting to stockholders a plan for the complete liquidation of KIC.

In general terms the plan that the Directors proposed called for the immediate distribution of KIC's portfolio; the other, non-portfolio assets were to be disposed of and cash distributions made of the proceeds to the shareholders. On March 20, 1977 the Directors sent all KIC stockholders of record as of March 14, 1977 a Notice and Proxy Statement for a Special Meeting of Stockholders to consider the plan. The special meeting was held on April 20, 1977, with 73.2% of all KIC shares represented in person or by proxy. The plan was adopted by the affirmative vote of 98.8% of all votes cast.

This suit was commenced on April 26, 1977. Both the original and First Amended Complaint sought to enjoin the imminent distribution of the KIC portfolio. Each did so on the basis that the proxy materials soliciting shareholder approval of the liquidation were materially misleading in failing to discuss the possibility that KIC might garner a higher price for the portfolio stock, that is, a "control premium" were the stock to be sold rather than distributed. Expedited discovery was ordered and numerous depositions taken. On May 27, 1977 the matter came on for hearing before this Court on plaintiffs' motion for a preliminary injunction and defendants' motion to dismiss. Upon reviewing the voluminous briefs, depositions, affidavits and other documents that the parties filed, it became apparent that plaintiffs' "alternative plan" was riddled with uncertain issues of state corporation and federal taxation law. Two issues in particular cast serious doubt on its feasibility: (1) whether any "control premium" would be dissipated by the require-

ment, emerging in California and other jurisdictions, that minority shareholders be invited to share in it, e. g., *Jones v. Ahmanson & Co.,* 1 Cal.3d 93, 81 Cal.Rptr. 592, 460 P.2d 464 (1969); see *Perlman v. Feldmann,* 219 F.2d 173 (2d Cir.), *cert. denied,* 349 U.S. 952, 75 S.Ct. 880, 99 L.Ed. 1277 (1955); *Donahue v. Rodd Electrotype Co.,* 367 Mass. 578, 328 N.E.2d 505 (1975); and (2) whether KIC could avail itself of the nonrecognition provisions of section 337 of the Internal Revenue Code to avoid the crushing $150,000,000 capital gains tax that would otherwise be imposed on the sale of its portfolio at its then market value and satisfy the twelve-month limitation period contained in that statute either by selling all its assets within that period or by transferring its unsold assets to a liquidating trust. Without voicing an opinion as to which way another court in another jurisdiction would decide these issues, this Court concluded that their genuinely unresolved character supported the soundness of the Directors' business judgment in opting for a plan, perhaps less rewarding than that proposed by plaintiffs, but whose success was assured. The balance of hardships, too, lay with the defendants. Accordingly, this Court denied plaintiffs' motion for a preliminary injunction and ordered that the First Amended Complaint be dismissed without prejudice.

On July 18, 1977 plaintiffs filed their Second Amended Complaint. The theory of the suit remains the same: that, by distributing the KIC portfolio, the Directors sacrificed a "control premium" that could have been realized without adverse tax consequences by resort to the liquidating trust device. However, the Second Amended Complaint expands the list of material facts whose omission allegedly lulled the KIC shareholders into the belief the plan was in their best interests. Thus it is alleged that the proxy materials were materially misleading in that they failed to disclose: (1) that a control premium might have been realized had KIC sold its portfolio; (2) that even though all KIC's assets might not have been disposed of within twelve months, the non-recognition treatment provided by sec-

tion 337 could have been secured by transfer of all unsold assets to a liquidating trust; (3) that the plan well-served the special interests of KIC's principal stockholders, the Kaiser Foundation and the Kaiser family, solving the divestiture problems that the Tax Reform Act of 1969 created for them (26 U.S.C. § 4943) while perpetuating their control of the Kaiser empire[2]; and (4) that the endorsement given the plan by First Boston Corporation was not the product of independent, rigorous review.[3]

The proxy rules promulgated by the SEC bar the use of proxy statements that are materially false or misleading in presentation or omission of material facts. "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). Materiality does not depend on causation in the sense that the defect must be shown to

**2.** The Kaiser Foundation is a private foundation within the meaning of 26 U.S.C. § 509. As such it is subject to the excess business holdings rule introduced into the Internal Revenue Code by the Tax Reform Act of 1969, 26 U.S.C. § 4943. That statute provides that if, after May 26, 1979, more than 2% of a corporation's stock is held by "disqualified persons" then an affiliated private foundation cannot own more than 25% of such a corporation without incurring a 200% excise tax on its excess holdings. 26 U.S.C. § 4943(c)(4)(D)(i). Prior to liquidation the Kaiser Foundation owned 30.6% of KIC while Edgar F. Kaiser and the Estate of Sue Mead Kaiser, both "disqualified persons," owned another 6.6%. As a result of the liquidation the Kaiser Foundation now owns only 11.4% of KACC (30.6% × 37.4%), 17.2% of KSC (30.6% × 56.3%) and 11.4% of KC&GC (30.6% × 37.1%), with the result that its stockholdings have been brought down to acceptable limits.

**3.** The complaint also alleges that the proxy statement violated the "clearly presented" requirement of SEC Rule 14a–5, 17 C.F.R. § 240.-14a–5, in its discussion of the tax consequences of the liquidation. The plaintiffs find no fault with the thorough discussion given the tax consequences to the *shareholders.* They urge, however, that the discussion of the tax consequences to the *corporation* was inadequate. In this regard the proxy materials state:

"The Corporation will recognize no gain or loss on any distribution of property to its shareholders or to the liquidation agent, but any net gain from the disposition of the Corporation's assets is expected to be taxable to the Corporation."

The plaintiffs argue that this statement is meaningless to the average shareholder, presupposing a legalistic understanding of the distinction between "distribution" and "disposition" that resort to the dictionary would not supply. The plaintiffs further allege that the proxy materials should have amplified their discussion by including a statement to the ef-

fect that "management estimates that the Plan will give rise to capital gains tax liability in the amount of from $1 million to $16 million."

These allegations are patently frivolous. "[C]orporations are not required to address their stockholders as if they were children in kindergarten." *Richland v. Crandall,* 262 F.Supp. 538, 554 (S.D.N.Y.1967.) Any person reading the above-quoted portion of the proxy materials would immediately recognize that "distribution" and "disposition" were being used in contradistinction to each other. Resort to the dictionary to glean the meaning of the distinction was unnecessary, for it is one that is drawn throughout the proxy materials. Thus, in introducing the plan, the statement provides:

"The Plan envisions two principal steps: (1) the pro rata *distribution* to stockholders of the Corporation's common stockholdings . . . ; and (2) the *disposition* of the Corporation's other assets and pro rata *distribution* or *distributions* of the net proceeds of such *disposition* to the Corporation's stockholders . . ."

Perhaps greater clarity might have been achieved by inserting a parenthetical explanation of the distinction. However, on careful reading the meaning is clear. "We do not rule out the possibility that a proxy statement could be drafted so poorly that the 'clearly presented' requirement of Rule 14a–5 would provide a predicate for relief. But it would not serve the purposes of § 14(a) to engage the federal judges as teachers of legal draftsmanship with the mission of improving the style and form of proxy statements, for it is not at all clear that we would do the job any better than the SEC." *Ash v. LFE Corp.,* 525 F.2d 215, 221 (3d Cir. 1975). Further, to disclose the estimated tax liability with respect to sales yet to be made would come dangerously close to the kind of crystal ball-gazing that is elsewhere proscribed. See Note following SEC Rule 14a–9, 17 C.F.R. § 240.14a–9.

have had a decisive effect on the outcome of the vote. It is enough that the proxy statement, as distinguished from the fact omitted or misrepresented, be "an essential link in the accomplishment of the transaction." *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 385, 90 S.Ct. 616, 622, 24 L.Ed.2d 593 (1970).

As a mixed question of law and fact, the materiality of an omission or misrepresentation rarely is the proper subject for summary adjudication. Nonetheless, the disclosure policy embodied in Rule 14a–9 is not without practical limit. In view of the substantial liabilities that may result, the need to ensure full disclosure must be balanced against the danger that, by setting too low a threshold for civil liability, "management's fear of exposing itself to . . . liability may cause it simply to bury the shareholders in an avalanche of trivial information—a result that is hardly conducive to informed decisionmaking." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. at 448–49, 96 S.Ct. at 2132. Further, in effectuating the disclosure policies of the federal securities laws, care must be taken to avoid "federaliz[ing] the substantial portion of the law of corporations that deals with transactions in securities, particularly where established state policies of corporate regulation would be overridden." *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 479, 97 S.Ct. 1292, 1304, 51 L.Ed.2d 480 (1977); see *Browning Deben. Holders' Comm. v. DASA Corp.,* 560 F.2d 1078 (2d Cir. 1977).

■ While full and fair disclosure is required, complete revelation is not. SEC Rule 14a–9 itself speaks in terms of *facts:* management is not required to set before shareholders information only suggestive of mere possibility, *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. at 463, 96 S.Ct. 2126; see *Scott v. Multi-Amp Corp.,* 386 F.Supp. 44, 65 (D.N.J.1974); *Alameda Oil*

*Co. v. Ideal Basic Industries, Inc.,* 337 F.Supp. 194 (D.Colo.1972) (in proposing merger or sale management must reveal any higher "firm offers" but not mere "feelers"); nor is it required to go beyond revelation of facts and debate issues of law. *Ash v. LFE Corp.,* 525 F.2d 215 (3d Cir. 1975); *Voege v. Magnavox Co.,* 439 F.Supp. 935 (D.Del.1977); *Shapiro v. Belmont Industries, Inc.,* 438 F.Supp. 284, 293–94 (E.D. Pa.1977); *Freedman v. Barrow,* 427 F.Supp. 1129, 1143–46 (S.D.N.Y.1976). Similarly, management is not required to discuss the panoply of possible alternatives to the course of action it is proposing, absent perhaps some suggestion that the route not chosen was so well recognized and legally sound that the failure to pursue it demands consideration. *Allen v. Penn Central Corp.,* 350 F.Supp. 697 (E.D.Pa.1972); *Doyle v. Milton,* 73 F.Supp. 281 (S.D.N.Y.1947); *Shapiro v. Belmont Industries, Inc.,* 438 F.Supp. 284 (E.D.Pa.1977). These limitations are born of a recognition that too much information can be as misleading as too little. They also make sense as a matter of state corporation law, which gives shareholders a right of veto or approval over organic corporate changes but entrusts management with the task of devising the means by which the end will be reached. See Henn, Handbook on the Law of Corporations § 701 (2d ed. 1970).

■ The failure to disclose that KIC might garner a "control premium" or accomplish the liquidation in tax-free fashion was immaterial as a matter of law. Under Nevada law the shareholders were entitled to decide whether or not KIC should embark on liquidation, not to pick and choose among the various routes that could be taken to that end. N.R.S. 78.565 governs stockholder approval of a disposition of all corporate assets and N.R.S. 78.580 requires stockholder approval of a corporate dissolution.[4] In proposing liquidation manage-

4. NRS 78.565 is without judicial gloss. Its provisions parallel those of 8 Del.C. § 271. The cases which have construed the latter make clear that the directors are presumed to have

exercised sound business judgment in devising the plan of liquidation. Absent a showing of fraud, or prices so inadequate to carry the badge of constructive fraud, that presumption

ment was not entitled to paint an overly optimistic picture of the results the liquidation would accomplish. Far from being definite or certain, the putative "facts" regarding a "control premium" and the availability of section 337 treatment appear both practically and legally speculative. The only evidence attesting to the existence of such a premium is entirely theoretical.[5] Even assuming its availability, the possibility that KIC could bring its liquidation within the nonrecognition provisions of section 337 and avoid the $150,000,000 capital gains tax that would otherwise be imposed on the sale of its portfolio is legally remote. To date transfers to liquidating trusts have been held to satisfy the "complete liquidation within twelve months" requirement of section 337 only when: (1) the asset transferred was one not reasonably susceptible to sale *or* distribution, Rev.Rul. 72–137, 1972–1 Cum.Bull. 101; Rev.Rul. 63–245, 1963–2 Cum.Bull. 144; and (2) the powers of the trustees to conduct active business were curtailed, Treas.Reg. § 301.7701–4; *Abraham v. United States,* 406 F.2d 1259 (6th Cir. 1969); *Mullendore Trust Co. v. United States,* 59–1 U.S.T.C. ¶ 9256, *aff'd,* 271 F.2d 748 (10th Cir. 1959); B. Bittker & J. Eustace, Federal Income Taxation of Corporations and Shareholders at pp. 2–10 (3d ed. 1971); Pomeroy, Problems of Winding Down the Corporate Operation, 35 N.Y. U.Inst.Fed.Tax. 673, 684–85 n.32 (1977); Kramer, Liquidation Options: Sections 331, 333 & 337, 29 N.Y.U.Inst.Fed.Tax. 293, 308– 10 (1971); but see Note, Liquidating Trusts and Section 337, 34 U.Chi.L.Rev. 563 (1967). Just as it is difficult to imagine assets more saleable or distributable than shares of stock traded on the national exchanges, Rev.Proc. 79–1, 1979 Int.Rev.Bull. 31, it is hard to conceive of less passive activities than those conducted by the KIC operating divisions. Further, the reincorporation aspects of transferring some of those assets to a liquidating trust would have precluded KIC from procuring a letter ruling. Rev. Proc. 72–9, 1972–1 Cum.Bull. 719; see Rev. Proc. 79–1, supra; Rev.Proc. 75–32, 1975–2 Cum.Bull. 555. Nothing in the securities law requires management to discuss novel and uncharted areas of the law in a proxy solicitation. KIC cannot be faulted for failing to disclose "a legal theory with which the corporation did not agree and which was never called to its attention." *Ash v. LFE Corp.,* 525 F.2d at 220.

Plaintiffs urge that their allegations regarding the roles played by First Boston and the Kaiser Foundation present triable issues of fact, even if their other allegations are proper subjects for summary adjudication. Whether these facts would have assumed significance in the mind of a shareholder who was in the process of deciding how to vote, or indeed, with respect to First Boston, whether any omission occurred at all, seems highly debatable. In view of the fact that KIC's stockholders stood to double the value of their holdings by approving the plan, it seems quite unlikely that they would have used these facts to vote down the liquidation. "The determination [of materiality] requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *TSC Industries, Inc.*

---

insulates their activities from review. See *Marks v. Wolfson,* 41 Del.Ch. 115, 188 A.2d 680 (1963); *Smith v. The Good Music Station,* 36 Del.Ch. 262, 129 A.2d 242 (1957).

**5.** There is no evidence in the record that KIC received anything approaching a "firm offer" for any of its Affiliates. Indeed, the only evidence suggesting that a control premium might be available is contained in the deposition of plaintiffs' expert, Professor Jeffrey Jaffe. It is clear as a matter of law that KIC could not prudently accept a premium over market value without insisting that a similar offer be made to the Affiliates' other shareholders. E. g., *Jones v. Ahmanson & Co.,* supra. Professor Jaffe's opinion that many control blocks can command a premium of up to 20% must be evaluated, then, in light of his statement that avoidance of the costs and hazards of a tender offer partially explains the availability of such premiums.

*v. Northway, Inc.,* 426 U.S. at 450, 96 S.Ct. at 2133 (footnote omitted). The keystone of the definition of materiality is not causation, but the effectuation of the congressional purpose of ensuring full and fair disclosure. *Mills v. Electric Auto-Lite,* 396 U.S. at 382, 90 S.Ct. 616. The possibility that the shareholders would have used these facts to defeat the liquidation thus is sufficient to raise the spectre of materiality. See *Cole v. Schenley,* 563 F.2d 35 (2d Cir. 1977); *Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374, 382–83 (2d Cir. 1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975); *Gerstle v. Gamble-Skogmo, Inc.,* 478 F.2d 1281, 1302–03 (2d Cir. 1973).

The definition of materiality remains constant whether the suit is one by the SEC to enjoin the dissemination of misleading proxy materials or one by a private party to recover damages. *Mills v. Electric Auto-Lite Co.,* 396 U.S. at 382, 90 S.Ct. 616. Because section 28(a) of the Securities Exchange Act limits recovery to "actual damages," however, more in the way of causation must be shown in suits where damages are sought. See *Dasho v. Susquehanna Corp.,* 461 F.2d 11, 30–31 (7th Cir.), *cert. denied,* 408 U.S. 925, 92 S.Ct. 2496, 33 L.Ed.2d 336 (1972). It is thus possible to have suffered "legal injury" without sustaining "pecuniary loss." *Id.; see Pierre J. LeLandais & Co. v. MDS–Atron, Inc.,* 543 F.2d 421 (2d Cir. 1976), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 786, 50 L.Ed.2d 777 (1977); *Swanson v. Amer. Cons. Industries, Inc.,* 475 F.2d 516 (7th Cir. 1973); *Polin v. Conductron Corp.,* 411 F.Supp. 698, 702 (E.D.Mo.1976), *aff'd,* 552 F.2d 797 (8th Cir.), *cert. denied,* 434 U.S. 857, 98 S.Ct. 178, 54 L.Ed.2d 129 (1977). In that instance, dismissal is appropriate. *Levine v. Seilon, Inc.,* 439 F.2d 328 (2d Cir. 1971).

■ The Second Amended Complaint seeks both damages and injunctive relief. Ordinarily a trial court ought not foreclose equitable relief in advance of trial. The Court of Appeals for the Ninth Circuit has sanctioned such measures, however, under extraordinary circumstances such as obtain in this case. *Yamamoto v. Omiya,* 564 F.2d 1319 (1977). Here as in *Yamamoto* the transaction complained of has been accomplished. To undo it would subject KIC to third-party breach of contract claims far exceeding the value of any benefit thereby to be conferred. *Id.* at 1324. Indeed, it is doubtful whether any benefit would inure to KIC, as the twelve-month period within which to qualify the liquidation under section 337 has long since passed. Further, the plaintiffs' good faith is open to some question. Although the Directors announced their intention of liquidating KIC in May, 1976, plaintiffs did not communicate their ideas to anyone until April, 1977 when they filed this suit. This Court's denial of their motion for preliminary injunctive relief sounded the eleventh hour for their hopes of obtaining effective injunctive relief, yet they failed to prosecute an interlocutory appeal. "[S]etting aside consummated action goes to discretion and balancing of the equities (with due regard for the rights of innocent third persons)." 2 L. Loss, Securities Regulation 967 (2d ed. 1961), *quoted with approval in Yamamoto v. Omiya,* 564 F.2d at 1324. Under the circumstances there is simply no basis upon which the award of such extraordinary relief could be justified.

■ Turning to plaintiffs' damages claim, the shareholders' approval of the liquidation caused shareholders "monetary injury only if (a) [KIC] would have been better off with no [liquidation] at all; or (b) . . . more favorable [terms] would have been available if there had been full disclosure." *Dasho v. Susquehanna Corp.,* 461 F.2d at 31; see *Swanson v. Amer. Cons. Industries, Inc.,* 475 F.2d at 519. Plaintiffs are not trying to vindicate an inchoate right to continue KIC in operation; indeed, they concede that the plan of liquidation worked to their economic benefit. See n.1, supra. The sole allegation of injury stems from their contention that KIC sacrificed a control premium when it distributed its portfolio. "The *Bigelow [Bigelow v. RKO Radio*

*Pictures, Inc.,* 327 U.S. 251, [66 S.Ct. 574, 90 L.Ed. 652] (1946)] rule that uncertainty as to the *amount* of damages is to be cast on a wrongdoer does not extend to uncertainty as to the *fact* of damages." *Simon v. New Haven Bd. & Carton Co.,* 516 F.2d 303, 306 (2d Cir. 1975) (emphasis in original). This Court has reviewed the plaintiffs' theories regarding a "control premium" and section 337 treatment thoroughly, and found them sufficiently devoid of factual or legal support to render them speculative as a matter of law. As such they cannot serve to establish injury in fact.

During oral argument the Court questioned counsel respecting proof of damages and accorded an opportunity to supply post-argument memoranda. Proof of "actual damages" is an essential element of an action for damages for alleged violations of the Securities Exchange Act of 1934 (15 U.S.C. § 78bb(a)). To support a case against a motion for summary judgment it is plaintiffs' obligation to demonstrate that acceptable proof of actual damages is available. This the plaintiffs have failed to do. So, assuming for purposes of argument that the proxy disclosures regarding the activities of First Boston Corporation and regarding the special tax problem of the Kaiser Foundation were so inadequate as to be materially misleading, and that the trier of fact would so find, no means of proving actual damage to plaintiffs has been even suggested. Inasmuch as the value of the portfolio stock at market versus its control premium value has been rejected as an acceptable measure of damages, plaintiffs are left with an unsupportable claim for relief.

Plaintiffs' sole claim to federal jurisdiction is section 27 of the Securities Exchange Act of 1934. Their derivative and state law claims rest upon the doctrine of pendent jurisdiction to demand the attention of the Court. They also rest upon uncharted and unprecedented problems and issues under the Nevada corporation laws. In these circumstances it is appropriate that the Court decline jurisdiction of the pendent claims.

*United Mine Workers v. Gibbs,* 383 U.S. 715, 726–7, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Shapiro v. Belmont Industries, Inc.* (supra).

In consideration of the premises,

*IT HEREBY IS ORDERED* that defendants' motion for summary judgment is hereby granted.